(655 P.2d 465)

No. 53,788

FRANK E. WEBB and NORMA WEBB, *Appellants*, v. CHARLES P. POMEROY and EMERSON POMEROY, *Appellees*.

Opinion filed December 16, 1982.

*Paul C. Nelson* and *Randall J. Forbes*, of Crane, Martin, Claussen, Hamilton & Forbes, of Topeka, for the appellants.

*Donna M. Dill*, of Schroeder, Heeney, Groff & Hiebert, a Professional Association, of Topeka, for the appellee Charles P. Pomeroy.

*Elwaine F. Pomeroy*, of Pomeroy and Pomeroy, of Topeka, for the appellee Emerson Pomeroy.

WOLESLAGEL, J.: The plaintiffs directly appeal from a directed verdict at the conclusion of the evidence entered in favor of each defendant during a jury trial. In chronological order, the issues involved in this appeal are:

1. A claim of legal malpractice against Charles Pomeroy, who is not an attorney, in representing plaintiffs in a real estate transaction.

2. A claim of fraudulent misrepresentation and concealment by Charles Pomeroy as to the effectiveness of the services he undertook for the plaintiffs.

3. A claim of legal malpractice against Charles' brother, Emerson Pomeroy (hereafter E. Pomeroy), who is an attorney, in representing plaintiffs in a lawsuit he filed which purported to establish the validity of the services his brother performed for the plaintiffs.

As will be detailed, in 1971 the plaintiffs transferred their interest in 56 acres of land and their home to Mr. and Mrs. Earnest Emerson in order to prevent foreclosure and cancellation of their contract of sale. Charles handled the transaction and, according to plaintiff, continually promised to secure repurchase rights from the Emersons and repeatedly indicated that he had done so. When the Emersons indicated the property was theirs some years later, the plaintiffs, as suggested by Charles, employed Emerson Pomeroy to represent them in a lawsuit. He appeared in court in their 1975 suit against the Emersons to quiet plaintiffs' title to the land. That suit resulted in title being found to be in the Emersons, notwithstanding Charles' work and his assurances. That suit will be referred to as "the underlying suit."

Within seven months after the decision in the underlying suit, this suit was brought claiming malpractice by both Charles and E. Pomeroy.

The evidence in this trial showed that the Webbs were being foreclosed on their purchase of the land. Unable to refinance, they called on their friends, the Earnest Emersons, who were able to borrow about $13,500 and advance about $5,900 of their own money. The Webbs added about $1,400 and these funds forestalled the foreclosure proceedings. Charles Pomeroy had prepared the Webbs' income tax return and they went to him for

advice on handling the matter in such a way that, upon repaying the Emersons, they would regain title to the property.

Charles advised them he could handle everything except appearing in court. He prepared a deed from them to the Emersons, a repurchase contract from the Emersons to the Webbs, with many conditions left blank, and a deed from the Emersons to the Webbs. Charles handled the paper work for "the closing" at a savings association which loaned the money to the Emersons. The deed to the Emersons was delivered to them. Although he did sign the deed back to plaintiffs, Earnest Emerson later refused to sign the repurchase contract. When advised of this, Charles said he would take care of it and assured the Webbs then, and periodically through the years from 1971 until 1975, that they had an enforceable agreement.

The Webbs continued to live on the property, made some improvements, and until 1975 made most of the monthly payments due the savings company on Emersons' loan plus several $1,000 per year payments to the Emersons which they claimed was in accordance with their agreement as reimbursement for the $5,900 advanced by the Emersons. The Emersons regarded this as rent.

In 1975 the Webbs learned that the Emersons were considering selling the farm. They contacted Charles and he indicated he would file a quiet title suit on their behalf. This underlying suit was filed in July and E. Pomeroy appeared for plaintiffs in that proceeding. At E. Pomeroy's direction, they thereafter made payments under the alleged repurchase agreement into Topeka Escrow Service.

Having no written repurchase contract, the Webbs needed to prove the terms and conditions of a supposed oral contract in this underlying suit. The decision of the trial judge was that they did not do so. In effect they claim in this suit that E. Pomeroy failed to produce available evidence to supply all necessary terms and conditions.

Before leaving the earlier underlying suit, there were some findings that have relevance in this action as it relates to Charles. In addition to the unexecuted repurchase contract, Charles prepared a contract from the Webbs to the Emersons. All parties signed this and one copy was returned to Charles. The trial judge found that thereupon Charles added this phrase: "That purchaser will resell to Seller for $19,000 plus interest."

The trial judge also found the deed back to the plaintiffs was valid only if the repurchase contract had been signed. Charles said he delivered this deed to Topeka Escrow Service within a week after receiving it but the secretary for that service said nothing was in that file until July, 1975, except a blank escrow agreement and there was never a signed escrow agreement covering the disposition of funds paid into it.

### Directed Verdict as to Emerson Pomeroy

The Webbs recognize that in order to recover against E. Pomeroy they are subject to the "but for" rule: But for the negligence of our attorney we would have had a successful result in the (underlying) lawsuit. To satisfy this rule, it was necessary that the Webbs successfully retry the underlying lawsuit in this suit.

"Thus, the plaintiff in a legal malpractice case has not only to prove the four basic elements as in all negligence cases but may be asked to prove three additional factors: that the underlying claim was valid; that it would have resulted in a favorable judgment had it not been for the attorney's error; and that the judgement was collectable." Meiselman, *Attorney Malpractice: Law and Procedure* § 3:5 at 44 (1980).

For a number of reasons, the Webbs in this suit failed to prove their underlying suit, *i.e.*, that they had a valid enforceable contract with the Emersons. Of controlling significance is their failure to show a meeting of the minds on interest. Both Mr. and Mrs. Webb gave conflicting testimony as to interest on the $5,900 advanced by the Emersons: "no interest," "interest was to be paid," "it was not discussed." Thus one of the vital terms of the alleged contract was never established.

We hold that the directed verdict in favor of E. Pomeroy was proper. His request for costs and attorney fees, however, is denied.

### Directed Verdict as to Charles Pomeroy

The validity of the trial court's judgment in favor of C. Pomeroy is not so readily resolved. The petition alleges breach of contract and tort. We believe it sounds basically in tort and address that only. The trial court found it was barred by the two-year statute of limitations, measured from the commission of the tort in 1971.

The limitation is governed by K.S.A. 60-513(*b*). The relevant part of that statute states that a cause of action "shall not be

deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party."

While it might be argued the statute is somewhat ambiguous in that it may provide two differing guides for a given circumstance, we believe the plaintiffs fall within its protection. As to the first guide, it may be said that if the underlying lawsuit had resolved in their favor, they would have had no injury. Thus, there could be no cause of action until that decision went against them. As to the second guide, Charles argues they should have gone to a lawyer when Mr. Emerson wouldn't sign the repurchase contract. This is a surprising argument as we believe the injury was not "reasonably ascertainable" so long as he, purporting to act as their lawyer, kept assuring them they had a binding repurchase agreement.

Our position as to the first guide is supported by *Price, Administrator v. Holmes*, 198 Kan. 100, 422 P.2d 976 (1967). In that case the limitation for malpractice in drafting a will was found to start when the will was declared invalid rather than when it was drafted. Assuming that medical malpractice is a similar tort to legal malpractice insofar as the statute of limitations to be applied, this position is also supported by *Hecht v. First National Bank & Trust Co.*, 208 Kan. 84, 490 P.2d 649 (1971).

Before discussing our position as to the second guide in determining when the statute of limitations began to run, it is necessary to consider what was the legal relationship between Charles and the plaintiffs, and what was his resulting duty. We hold he was in the same position as a regularly admitted practicing attorney and bound to the same degree of knowlege, skill, dedication, and ethical conduct as the average member of the bar.

In *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 553 P.2d 254 (1976), a nonlawyer corporation undertook the handling of legal papers relative to the purchase of a house. Upon its mishandling the matter, it was found to have "assumed to discharge the same duties as an individual conveyancer or attorney." Having done so, it was "governed by the principles applicable to attorney and client." The court also noted that "the

relationship of an attorney to his client is fiduciary in character, binding the attorney to the highest degree of fidelity and good faith to his client." 220 Kan. at 261.

To apply these rules to Charles, he is held to have known, whether he really did or not, that there was no binding oral reconveyance contract. His conduct in adding the phrase to the signed copy of the first contract, his assurance that he would get Mr. Emerson's signature to the reconveyance contract, and his handling of the reconveyance deed would suggest he did know.

This brings us to his assurances that the Webbs had a valid repurchase agreement. It is not consistent with "the highest degree of fidelity and good faith" to a client, as expressed in *Ford* to knowingly misrepresent. Rather, the lawyer's duty is to fully disclose. A client is entitled to rely on that duty. In our view, these reassurances constituted fraudulent concealment. As stated in *Friends University v. W. R. Grace & Co.*, 227 Kan. 559, 564, 608 P.2d 936 (1980), "any statement, word, or act which tends to the suppression of the truth renders the concealment fraudulent."

It therefore follows that Charles seeks to take advantage of his wrongful conduct when he claims the plaintiffs should have sought a lawyer. He suggested this to support his claim that their injury was "reasonably ascertainable" as soon as Mr. Emerson refused to sign the repurchase agreement. It likewise follows that the plaintiffs are within the protection of K.S.A. 60-513(*b*), whichever guideline applies.

To support fraudulent concealment, the quality of evidence must be clear and convincing. *Weigand v. Union Nat'l Bank of Wichita*, 227 Kan. 747, Syl. ¶ 2, 610 P.2d 572 (1980). We do not speculate as to how the Webbs' evidence may stand up if Charles puts on evidence, but at the stage of the evidence as we have it at this time, their evidence is not controverted and meets that test.

Charles requests that we rule on a claim of estoppel. This issue was not presented to the trial court and accordingly is not subject to appellate review. *City of Salina v. Jaggers*, 228 Kan. 155, Syl. ¶ 3, 612 P.2d 618 (1980).

The directed verdict is affirmed as to Emerson Pomeroy and reversed and remanded for a new trial as to Charles Pomeroy.