No. 63,904

DEARBORN ANIMAL CLINIC, P.A., *et al.*, *Appellant*, v. CHARLES
R. WILSON, *Appellee*.

(806 P.2d 997)

258

Opinion filed March 1, 1991.

*Zygmunt J. Jarczyk*, of Kansas City, argued the cause and was on the brief for appellant.

*James D. Griffin*, of Blackwell Sanders Matheny Weary & Lombardi, of Overland Park, argued the cause, and *Michael P. Mergen*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

HOLMES, C.J.: Plaintiffs, Dearborn Animal Clinic, P.A., and Central Animal Hospital, Inc., appeal from an order of summary judgment in favor of the defendant in a legal malpractice action filed against their former attorney, Charles R. Wilson. The trial court held the action was barred by the statute of limitations, K.S.A. 60-513. The Court of Appeals affirmed the trial court in an unpublished opinion, *Dearborn Animal Hosp. v. Wilson*, No. 63,904, filed May 25, 1990. We granted review, and we now affirm the Court of Appeals and the district court.

The facts are complicated and will be set forth in detail. Dearborn Animal Clinic, P.A., (Dearborn) was a professional corporation owned by Jim Guglielmino, D.V.M., and Patricia Stewart, D.V.M. Dearborn owned and operated several veterinary clinics in the Johnson County area. Central Animal Hospital, Inc., (Central) was a corporation which owned veterinary equipment. Dearborn owned two-thirds of the capital stock of Central and William L. (Luke) Fry, D.V.M., owned the other one-third. Several area veterinary clinics used Central's equipment and paid a percentage of their gross revenues to Central for the use of such equipment.

In the fall of 1984, Dearborn decided to sell one of its clinics, the Antioch 75 Clinic, and stock in Central to Thomas Holenbeck, D.V.M. Charles R. Wilson (Wilson or defendant), an attorney for Dearborn and Central, was asked to draft an asset purchase agreement between Dearborn and Holenbeck. Dr. Guglielmino testified he told Wilson to be sure Holenbeck was required to buy stock in Central. Wilson drafted the "Asset Purchase Agreement" which Dearborn and Holenbeck signed on November 30, 1984. Central was not a party to the agreement.

The contract provided for a purchase price of $82,500 to be paid in monthly installments for the Antioch 75 Clinic and $30,430

for one-fourth of the stock in Central. In December of 1984, Holenbeck began paying Dearborn $1,200 per month on the contract. In December of 1985, Holenbeck lowered his monthly payments to $879, informing Guglielmino that he had not purchased stock in Central and did not wish to exercise his option to purchase the stock.

On December 26, 1985, Glen Beal, an attorney for Dearborn, sent Holenbeck a letter, demanding full payment of the balance due on the $82,500 sales price plus interest and alleging that Holenbeck had breached the terms of the agreement. On December 30, 1985, Michael Merriam, an attorney for Holenbeck, responded by letter, stating in part: "I have advised Dr. Holenbeck that I see no duty on his part to do so under the terms of the agreement, as he is not in default in any respect, and even if he were, the contract does not provide for acceleration of the entire purchase price balance."

On February 26, 1986, Dearborn sued Holenbeck in Johnson County District Court for breach of contract. As a part of the original asset purchase agreement, Holenbeck had agreed to pay Central 20% of his gross revenues for the use of Central's equipment and services. Holenbeck stopped making such payments after Dearborn filed the Johnson County action.

The Johnson County lawsuit against Holenbeck will hereafter be referred to as the Holenbeck suit or the underlying action.

Discovery was undertaken in the Holenbeck suit and, although the record before us from that action is skimpy, it does include Dr. Stewart's answers on behalf of Dearborn to extensive interrogatories, and it appears that Stewart and Guglielmino were both deposed at length. The principal allegations in the Holenbeck suit, which are relevant to this appeal, were based upon the contentions of Guglielmino and Stewart that Holenbeck had made a binding agreement to buy one-fourth of the stock of Central and that he had breached the agreement by refusing to purchase the stock. The relevant portion of the contract on this issue read:

"8. Seller [Dearborn] shall take appropriate steps to have Buyer [Holenbeck] placed as a member of the Board of Directors of Central Animal Hospital, Inc. Further, Seller and its officers shall take such steps as are necessary to grant an option to purchase one-fourth of the issued and outstanding shares of Central Animal Hospital, Inc., said option to be exercised within

one year, but not sooner than following anticipated S.B.A. financing. The purchase price for said stock shall be $30,430."

In Dearborn's answers to Holenbeck's interrogatories, signed by Stewart on June 12, 1986, Stewart referred to the stock provision as a stock option, contending that Holenbeck had "executed upon the option" and "accepted the stock option" but stopped paying for the stock in December of 1985. In her deposition she testified that at the time the interrogatory answers were signed, it had become "unfortunately obvious" that Holenbeck had received only an option and "that what we thought we had wasn't really what we had."

Unfortunately, the record before us only includes selected bits and pieces of the depositions of Guglielmino and Stewart. We have only been furnished 9 pages of Stewart's deposition which apparently exceeded 154 pages and 3 pages of the Guglielmino deposition which exceeded 270 pages.

Following completion of discovery in the Holenbeck case, the defendant filed a motion for summary judgment and the court, on January 30, 1987, issued its order of partial summary judgment. In doing so the court found 42 uncontroverted facts and then concluded in part:

"2. With respect to Issue Number A-4 of Defendant's Motion for Partial Summary Judgment [the claim that Holenbeck was under an absolute requirement to purchase stock in Central and had breached that portion of the agreement], the Court makes the following findings:

"a. The provisions of Paragraph 8 of the Asset Purchase Agreement are as follows:

"8. Seller shall take appropriate steps to have Buyer placed as a member of the Board of Directors of Central Animal Hospital, Inc. Further, Seller and its officers shall take such steps as are necessary to grant an option to purchase one-fourth of the issued and outstanding shares of Central Animal Hospital, Inc., said option to be exercised within one year, but not sooner than following anticipated S.B.A. financing. The purchase price for said stock shall be $30,430.70.

"b. Plaintiffs contention is that the phrase 'said option to be exercised within one year' contained in such provision are words of mandatory obligation which require the defendant to purchase the stock within one year. However, the Court finds that the use of the term 'option' creates a true option on the part of the defendant which he alone may elect to exercise or not exercise, and no mandatory obligation is thus imposed.

"c. The Court further finds that plaintiffs contend the option to have been exercised by defendant. However, according to uncontroverted fact number

18 above, and uncontroverted facts numbers 20-27, inclusive, the Court must find that, for purposes of the Motion for Partial Summary Judgment, the uncontroverted fact is that the defendant did not exercise such option. Any payments made by the defendant which were applied by plaintiffs to the purchase price of such stock were made by the defendant in ignorance of such application.

"d. The Court therefore finds and concludes that the Defendant's Motion for Partial Summary Judgment designated Issue Number A-4, should be sustained."

The trial court went on to state, "[T]he Asset Purchase Agreement is interpreted to grant defendant an option to buy stock, which defendant did not exercise." Although not part of the record, we were advised in oral argument and in the briefs that the parties ultimately settled other aspects of the case by Holenbeck making a substantial payment to Dearborn and/or Central.

On August 16, 1988, this action was filed by Dearborn and Central, in Leavenworth County District Court, against Wilson for alleged malpractice in the preparation of the Dearborn/Holenbeck asset purchase agreement. The plaintiffs claimed, *inter alia*, that Wilson was negligent in drafting the agreement which granted Holenbeck an option to purchase Central stock rather than requiring he purchase it. In this action, plaintiffs' alleged damages included their legal expenses incurred in their litigation with Holenbeck in the underlying suit.

On April 14, 1989, Wilson filed a motion for summary judgment, contending that plaintiffs' suit was barred by the statute of limitations. A hearing was held on the motion on May 12, 1989. The court granted Wilson's motion. In the journal entry filed June 5, 1989, the court found:

"[T]he statute of limitations began to run in December of 1985, or at the latest February of 1986, when plaintiffs sustained substantial injury which was immediately ascertainable. The Court finds that at that time plaintiffs could have maintained an action against Charles R. Wilson and that nothing about the litigation between plaintiffs and Dr. Holenbeck precluded a claim against Charles Wilson."

The Court of Appeals, though not specifically stating the date the statute of limitations began to run, found that Dearborn incurred damages "the moment Holenbeck reneged on the agreement," suffering financial injury for Wilson's negligence and incurring legal expenses. The Court of Appeals further found that

"Dearborn knew as early as December 1985 that Wilson's purported unskillful drafting had, in all likelihood, created a pure option contract. Dearborn then was on notice that it had suffered damages due to the purported negligence of Wilson."

Though no final decision had been reached on the merits of the litigation between plaintiffs and Holenbeck until summary judgment was actually granted on March 9, 1987, the Court of Appeals observed that the critical information to trigger the running of the statute of limitations is knowledge of the fact, not the extent, of injury. *Brueck v. Krings*, 230 Kan. 466, 470-71, 638 P.2d 904 (1982). Accordingly, resolution of the underlying litigation would have affected the amount of the damages only, not the right to recover damages, if plaintiffs could prove the alleged malpractice of Wilson.

Plaintiffs then sought review of the Court of Appeals' decision, and we granted their petition. Plaintiffs contend that their cause of action did not accrue until their suit against Holenbeck was resolved against them, March 9, 1987, because this was the point in time in which they actually incurred damages or had actual knowledge of the fact of injury and thus could legally maintain an action against Wilson. If they had been successful in the underlying litigation with Holenbeck, they would have had no damages attributable to Wilson. To hold that the cause of action accrues before the underlying litigation is resolved, plaintiffs contend, would be to require them to file their malpractice suit contemporaneously with their suit against Holenbeck. To support their position, plaintiffs rely upon our decisions in *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 716 P.2d 575 (1986); *Price, Administrator v. Holmes*, 198 Kan. 100, 422 P.2d 976 (1967); and the Court of Appeals' decision in *Webb v. Pomeroy*, 8 Kan. App. 2d 246, 655 P.2d 465 (1982), *rev. denied* 232 Kan. 876 (1983).

Wilson contends that, under K.S.A. 60-513(b), the cause of action accrued more than two years before plaintiffs filed suit, because plaintiffs sustained damages and knew of his alleged negligent acts more than two years before they filed suit. Wilson distinguishes the cases plaintiffs rely upon and contends that nothing prevented plaintiffs from bringing their malpractice suit prior to the resolution of their suit against Holenbeck.

In granting summary judgment, the trial court adopted by reference 24 of the 25 uncontroverted facts alleged by Wilson in his motion for summary judgment and, in addition, made 3 additional findings of fact. The facts alleged by Wilson were meticulously keyed to the trial court record consisting primarily of the depositions of Guglielmino and Stewart and some documents. As the bulk of this record has not been furnished to us on appeal, most of the facts found to be true must be considered as such on appeal. The burden is on an appellant to designate a record sufficient to present appellant's position to an appellate court and to establish the claimed error. *State ex rel. Love v. One 1967 Chevrolet*, 247 Kan. 469, Syl. ¶ 6, 799 P.2d 1043 (1990).

We now turn to the issue before this court. Does the record which is before us, when read in the light most favorable to plaintiffs, require affirmance of the trial court's determination that the action was barred by the statute of limitations? We conclude it does.

It is undisputed that plaintiffs' malpractice action, based upon the alleged negligence of the defendant in preparing the Dearborn/Holenbeck asset purchase agreement, is governed by the two-year statute of limitations provided in K.S.A. 60-513(a)(4). K.S.A. 60-513(b) establishes when a cause of action based upon tort, with the exception of medical malpractice, accrues and provides in part:

"[T]he cause of action in this action [section] shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party . . . ."

The determination of when the cause of action in a legal malpractice action shall "be deemed to have accrued" has been the subject of several recent appellate cases. See *Pizel v. Zuspann*, 247 Kan. 54, 795 P.2d 42, *modified* 247 Kan. 699, 803 P.2d 205 (1990); *Pancake House, Inc. v. Redmond*, 239 Kan. 83; *Webb v. Pomeroy*, 8 Kan. App. 2d 246. In *Pancake House* we discussed the various theories which may be applied in determining when the statute of limitations begins to run, and stated:

"Depending upon the facts and circumstances of each case, there are at least four theories which can apply to attorney malpractice in Kansas as to when the accrual of a cause of action occurs and the statute of limitations begins to run. These include:

"(1) The occurrence rule—the statute begins to run at the occurrence of the lawyer's negligent act or omission.

"(2) The damage rule—the client does not accrue a cause of action for malpractice until he suffers appreciable harm or actual damage as a consequence of his lawyer's conduct.

"(3) The discovery rule—the statute does not begin to run until the client discovers, or reasonably should have discovered, the material facts essential to his cause of action against the attorney.

"(4) The continuous representation rule—the client's cause of action does not accrue until the attorney-client relationship is terminated.

For cases discussing all four points see Annot., 32 A.L.R.4th 260; ABA/BNA Lawyers' Manual on Professional Conduct § 301:901 (1985); Mallen and Levit, Legal Malpractice § 388 *et seq.* (2d ed. 1981)." 239 Kan. at 87.

These four theories or "rules" were again recognized by this court in *Pizel*, 247 Kan. at 76.

While the wording of K.S.A. 60-513(b) appears to be straightforward and easily understood, the application of the statute to various factual situations has resulted in a substantial body of litigation in various areas of tort liability. As a result, certain general principles have evolved. In applying the language of the statute, two alternatives are recognized depending upon the facts of the case. Under the first alternative, the cause of action "shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury." (K.S.A. 60-513(b). This court has found that this alternative codified the rule in *Kitchener v. Williams*, 171 Kan. 540, 236 P.2d 64 (1951), that "the statute of limitations commences to run when the injury, resulting from the negligent act, occurs." *Roe v. Diefendorf*, 236 Kan. 218, 221, 689 P.2d 855 (1984). See *Ruthrauff, Administratrix v. Kensinger*, 214 Kan. 185, 189, 519 P.2d 661 (1974).

Under the second alternative, "if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party." K.S.A. 60-513(b). We have found that this alternative "ameliorated the harsh result of the [first alternative] when applied to some of the malpractice cases where substantial injury occurs sometime after

the negligent act but may not be ascertainable as such for several years" (*Ruthrauff, Administratrix v. Kensinger*, 214 Kan. at 190, and "[w]hen there is an isolated act resulting in immediate injury not readily apparent to the innocent party" (*Olson v. State Highway Commission*, 235 Kan. 20, 24, 679 P.2d 167 [1984]). See 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-513 (1979).

The second alternative has frequently been applied in the areas of medical malpractice and products liability where the injury from the negligent act may not become apparent until some time after the act actually occurred. *Hecht v. First National Bank & Trust Co.*, 208 Kan. 84, 490 P.2d 649 (1971).

In many cases of alleged legal malpractice there are at least two areas of possible delay which may make it difficult to determine just when the statute of limitations began to run. Many times, as in the present case, the negligent act occurs at the time the attorney performs, or fails to perform, services for the client. However, there may be considerable lapse of time before the client actually suffers injury. An additional delay may occur between the time that the client suffered injury and the time that the client knew, or reasonably should have known, that the injury was caused by the attorney's malpractice. These delays have led to the recognition of the four theories set forth in *Pancake House* and *Pizel*. While some states have attempted to limit the issue to one particular theory, practice demonstrates that no matter how desirable it might be to have one black-letter rule that applied in every case, justice and fairness, as well as the statute, preclude the adoption of one theory to the exclusion of all others.

In the instant case the alleged negligent act of Wilson occurred at the time he prepared the Dearborn/Holenbeck agreement, and arguably the plaintiffs suffered injury at that time when they did not get the agreement that Dearborn hired Wilson to prepare. However, no actionable injury had occurred because Holenbeck might have elected to exercise his option in which case the plaintiffs would have suffered no injury even though Wilson was negligent in preparing the agreement. See *Roe v. Diefendorf*, 236 Kan. at 222-23. It is equally apparent that the fact that plaintiffs had suffered injury would not be reasonably ascertainable to them until some later time when the actual agreement became a matter of controversy between Dearborn and Holenbeck.

Plaintiffs contend that they could incur no damages or have knowledge of the fact of injury until the underlying litigation was resolved, because termination of the underlying litigation in their favor would have resulted in no injury caused by Wilson's negligence. The Court of Appeals held that injury was sustained when Holenbeck refused to pay for the stock and appellants began incurring legal expenses to enforce the contract. Relying upon the rule that it is knowledge of the fact, not the extent, of the injury, the Court of Appeals found that resolution of the underlying litigation would have affected the amount of damages only. We think the Court of Appeals' analysis was too simplistic.

While plaintiffs undoubtedly incurred monetary damage when they were forced to retain counsel to enforce the agreement as they understood it and suffered further damage when Holenbeck reduced his payments and declined to purchase the Central stock, the retention of counsel and the failure of Holenbeck to perform the agreement as contemplated by plaintiffs did not, per se, give rise to a cause of action against Wilson. In December of 1985 the plaintiffs were still under the impression that the Dearborn/Holenbeck agreement required Holenbeck to purchase the Central stock and in February 1986, apparently on the advice of new counsel, filed suit to enforce the agreement. Although the act which ultimately caused injury occurred when the agreement was drafted, the fact the injury was a result of the negligent act was not ascertainable until the plaintiffs knew or should have known of the negligence of Wilson. There was no reason for plaintiffs, who were not lawyers, to know that the agreement had not been properly drafted. That is why they hired an attorney in the first place—to prepare the agreement they wanted and thought they had received. The trial court concluded that the date for purposes of the running of the statute of limitations was February 1986, when suit was filed to enforce the agreement. In so holding, the judge stated, "The fact of the underlying litigation was the first instance that injury became reasonably ascertainable." We do not agree with the trial court. Suit was filed, presumably on the advice of counsel, to enforce what was alleged to be the mandatory obligation of Holenbeck to purchase the Central stock. It cannot be said that at that time it was reasonably ascertainable

to plaintiffs that their monetary damages were the result of Wilson's negligent performance.

Plaintiffs contend that so long as the underlying litigation remained unresolved they could not know whether their interpretation of the agreement was correct. It is argued that until the underlying litigation was decided they did not have reason to know that malpractice by Wilson had occurred. In support of their position, plaintiffs rely on several cases.

The first case appellants rely upon is *Price, Administrator v. Holmes*, 198 Kan. 100, 422 P.2d 975 (1967), in which the administrator of Lillian Price's estate sued Holmes, a banker, on June 4, 1965, for having secured the faulty execution of the will of Henry H. Weber. Weber was the uncle of Lillian Price and had contacted Holmes about a will. The uncle's will, drafted by Holmes and signed on November 16, 1960, gave one-half of Weber's estate to his wife and the other half to Lillian. After Weber's death, his will was offered for probate on November 26, 1960, and his wife contested the will, claiming it had not been legally executed. The probate and district courts admitted the will to probate but, on December 7, 1963, the Kansas Supreme Court reversed their decisions, finding the will void. *In re Estate of Weber*, 192 Kan. 258, 387 P.2d 165 (1963). Lillian died while the appeal in that case was still pending.

In the suit against Holmes, the trial court granted Holmes' motion for summary judgment, finding the cause of action barred by the statute of limitations and finding it did not survive Lillian's death. On appeal, the Kansas Supreme Court found two causes of action—a tort action for negligence and a contract action for breach of implied warranty—and then considered whether either action survived Lillian's death and was not barred by the statute of limitations.

Regarding the tort action, the court stated that the cause of action accrues when damage results and held that Lillian's cause of action did not accrue until her uncle's will was finally declared invalid by the Kansas Supreme Court on December 7, 1963. Because Lillian had died prior to the Supreme Court's decision in *Estate of Weber*, the tort cause of action did not survive her death. In discussing the tort cause of action for negligence, the court stated:

"[W]e are constrained to hold that any cause of action existing against Holmes for negligence accrued when this court declared Weber's will void on December 7, 1963. That was the date on which the ground fell from under Lillian Price; prior to that time the will had been held valid by two courts, and Lillian had suffered no damage at the hands of Mr. Holmes.

. . . .

". . . In the instant case, had no contest of Weber's will developed, Lillian Price would have sustained no such damage as plaintiff now claims. . . . [u]nder the circumstances present in this case, the tort action did not accrue until Weber's will was finally declared invalid." 198 Kan. at 105.

*Price* is clearly distinguishable from the facts in the present case in that the validity of the Weber will was upheld until final determination of the underlying lawsuit in this court. Prior to that time Lillian Price suffered no ascertainable injury.

Two other cases relied upon by plaintiffs, *Pancake House, Inc. v. Redmond,* 239 Kan. 83, 716 P.2d 575 (1984), and *Webb v. Pomeroy,* 8 Kan. App. 2d 246, 655 P.2d 465 (1982), along with our recent case of *Pizel v. Zuspann,* 247 Kan. 54, can arguably be said to stand for the general proposition that in a legal malpractice action, where there is underlying litigation, the statute of limitations does not begin to run until the underlying litigation is finally determined. However, those cases are clearly distinguishable from the case now before the court, and we see nothing to be gained by an exhaustive discussion of them.

The rationale for the argument of plaintiffs that the statute of limitations does not begin to run until the underlying litigation is finally determined was cogently stated by the Oregon Supreme Court in *U.S. Nat'l Bank v. Davies,* 274 Or. 663, 548 P.2d 666 (1976). In *Davies,* a malpractice suit was filed against the defendant attorneys to recover money the decedent had paid in settlement of a lawsuit with a corporation. The corporation had filed suit against the decedent on August 17, 1971, alleging that decedent's acceptance of corporate trust funds in payment for selling his stock was illegal. The defendant attorneys had advised decedent in 1967 to sell his stock in that manner. Settlement occurred in May 1973. The malpractice suit was filed November 5, 1974, to recover the settlement money the decedent paid the corporation and to recover the attorney fees incurred in defending the suit.

After finding the statute of limitations in a negligence case should not run until the occurrence of harm, because harm is an essential element of a negligence action, the Oregon Supreme Court considered the question of when damage occurred. The court stated:

"Defendants contend it occurred when decedent was sued or, in any event, as soon thereafter as decedent could hire competent counsel and could ascertain whether the claim against him was likely to be a valid one; and that, in either case, such a time was more than two years prior to the commencement of this case by plaintiff's decedent. There is no doubt that decedent's necessity to defend the action caused him damage more than two years prior to the commencement of the present action. It is not so clear, however, that at that time it could yet be determined that his expense *was caused by* negligent advice by defendants. In many situations the closeness of the legal questions involved would make it impossible to ascertain until the ultimate determination of the case whether it was brought as the result of the attorney's bad advice or whether it was the result of a misapprehension on the part of the party who sued as to his legal rights. In the present instance, if decedent had won the case brought against him, he would not normally be in a position to claim that negligent advice on the part of the present defendants was a cause of his expense of defense.

"When this case is tried, it might be shown that the outcome of the claim made against decedent was so crystal clear that upon securing legal advice decedent immediately knew either that he had a valid claim against defendants or that he did not; or, it might appear that no one could tell for certain whether the claim was good or bad. There is nothing about the filing of the claim against decedent together with the passage of any arbitrary lengths of time which, *as a matter of law*, demonstrates that decedent should have been aware at a time which makes the claim vulnerable to the statute that his necessity to defend the action was caused by defendants' advice. [Citations omitted.] The following statement from the previously cited Harvard Law Review article [*Developments—Statutes of Limitations*, 63 Harv. L. Rev. 1177 (1950)], at 1200, is appropriate:

'. . . The commencement of the statutory period has occasionally been delayed, despite the existence of a theoretical right to recovery, until the occurrence of some later event the absence of which made suit impossible or improbable: for example, until the plaintiff learned of the wrong or until substantial damage occurred. * * * .'

The author could just as logically have added, 'or until it appeared probable that the substantial damage actually suffered *was caused* by defendant.' *Kohler v. Woollen, Brown & Hawkins*, 15 Ill. App. 3d 455, 304 N.E.2d 677, 680-81 (1973); *Price v. Holmes*, 198 Kan. 100, 422 P.2d 976, 980-81 (1967); *Marchand v. Miazza*, 151 So. 2d 372, 375 (La. App. 1963).

"Plaintiff's decedent could have played it safe by filing an action against defendants immediately upon his being sued, in the event it subsequently

appeared defendants' negligent advice was the cause of the action brought against him. However, it does not seem wise to encourage the filing of such provisional actions. More important, it could prove to be disastrous to a plaintiff's defense of the action brought against him and, thus, perhaps disastrous to his former legal advisor as well. In the present case, plaintiff's decedent would have been defending one suit or action, claiming he had acted in conformance with the law, while simultaneously maintaining an action against defendants, claiming that he had not acted in conformance with the law because of faulty advice from defendants. Such an inconsistent position would have given rise to impeachment of decedent in his defense of the action brought against him, which certainly is not desirable from either of the present parties' point of view.

"This is one of those situations in which common sense dictates that a 'later event' (the appearance of decedent's probable liability) should take place before the statute commences to run." 274 Or. at 668-70.

The rule applied in *Davies* is consistent with the requirement of K.S.A. 60-513(b) that the statute of limitations does not begin to run until it is reasonably ascertainable that the injury suffered was the result of the defendants' malpractice. In a legal malpractice action in which there is underlying litigation which may be determinative of the alleged negligence of the attorney, the better rule, and the one which generally will be applicable under K.S.A. 60-513(b), is that the statute of limitations does not begin to run until the underlying litigation is finally determined. Ordinarily, as long as there is a good faith dispute, a layperson could not reasonably be expected to know that the dispute was caused by his attorney's negligence and the mere filing of an underlying lawsuit would not automatically trigger the running of the statute but would usually require a final determination of such an action. However, the rule that the underlying litigation must be finally determined before the statute of limitations begins to run cannot be arbitrarily applied in every case. If it is clear that the plaintiff in a potential legal malpractice action has incurred injury and if it is reasonably ascertainable that such injury was the result of the defendant attorney's negligence, then under K.S.A. 60-513(b) the statute begins to run at the time that it is reasonably ascertainable that the injury was caused by the attorney's malpractice even though the underlying action may not have been finally resolved.

In the instant case the plaintiffs clearly suffered monetary damage when they had to retain counsel to enforce their interpretation

of the contract and when Holenbeck reduced his payments and refused to purchase stock in Central. Further monetary damage was incurred in February 1986 when Holenbeck ceased making any payments to Central because of the lawsuit filed against him. However, it is not so clear that plaintiffs could reasonably ascertain at that time that· such injury was the result of Wilson's alleged negligence. In reliance upon new counsel, plaintiffs were still attempting to enforce their understanding of the Dearborn/ Holenbeck agreement. Thus, we conclude that the trial court's determination that the statute began to run no later than February 1986 and the implied holding of the Court of Appeals that it began in December 1985 are not conclusively supported by the record before us. Nevertheless, this does not conclude our consideration of this case nor control our decision. "The reasons given by a district court for its decision are immaterial so long as its ruling was correct for any reason." *Prairie State Bank v. Hoefgen,* 245 Kan. 236, Syl. ¶ 3, 777 P.2d 811 (1989).

The meager record before us makes it abundantly clear that at the time Dr. Stewart answered the interrogatories on behalf of Dearborn, on June 12, 1986, the Dearborn officers and stockholders knew that the Dearborn/Holenbeck agreement contained only an option for the Central stock and not a requirement that Holenbeck purchase the stock. Dr. Stewart, in her deposition taken after the interrogatories had been answered, testified that at the time the interrogatory answers were signed, it had become obvious to these plaintiffs that the agreement contained only an option for Holenbeck to purchase the Central stock.

We conclude that no later than June 12, 1986, the plaintiffs had suffered injury as a result of Wilson's alleged malpractice and that such injury was not only reasonably ascertainable but, in fact, had 'been ascertained by plaintiffs. The statute began to run no later than June 12, 1986, and as this action was not commenced until August 16, 1988, more than two years thereafter, the result reached by the trial court and the Court of Appeals was correct. The two-year statute of limitations had run and the trial court was correct in granting summary judgment to the defendant.

The judgments of the Court of Appeals and the trial court are affirmed.

ABBOTT, J., not participating.