(313 P.3d 64)
No. 108,353

JASON MASHANEY, *Appellant*, v. BOARD OF INDIGENTS' DEFENSE SERVICES, SARAH E. SWEET-MCKINNON, and VIRGINIA A. GIRARD-BRADY, *Appellees*.

Opinion filed November 8, 2013.

*Larry G. Michel* and *Angela D. Coble*, of Kennedy Berkley Yarnevich & Williamson, Chartered, of Salina, for appellant.

*Marty M. Snyder*, assistant attorney general, for appellee State Board of Indigents' Defense Services.

*Timothy J. Finnerty* and *Charles E. Hill*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Wichita, for appellee Sarah Sweet-McKinnon.

*Lyndon W. Vix* and *Sylvia B. Penner*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellee Virginia Girard-Brady.

Before ATCHESON, P.J., GREEN and MCANANY, JJ.

MCANANY, J.: Jason Mashaney's convictions for sex crimes were set aside and a new trial was ordered. Before the retrial Mashaney pled guilty to amended charges. He then sued his criminal defense lawyers for malpractice, but the district court dismissed his claims. Mashaney's appeal raises the following issues: (1) whether the Board of Indigents' Defense Services (BIDS) may be sued for legal malpractice; (2) whether Mashaney's civil malpractice claims against the individual attorneys are barred by our 2-year statute of limitations; (3) whether such malpractice claims are dependent upon Mashaney showing that he was actually innocent of the crim-

inal charges for which he was convicted; and (4) if so, whether an *Alford* plea of guilty to amended charges foreclosed Mashaney from proving his innocence.

We conclude that (1) BIDS, a subordinate government agency, does not have the capacity to sue or be sued. Therefore, BIDS was properly dismissed as a party. (2) With respect to the statute of limitations issue, Mashaney's cause of action for legal malpractice did not accrue until he obtained postconviction relief. Here, the postconviction relief resulted in Mashaney being granted a new trial. But the retrial did not take place because Mashaney pled guilty to reduced charges. (3) In his legal malpractice case Mashaney would have been required to show that he was actually innocent of the sex crimes for which he was tried and convicted in order to prevail. (4) But Mashaney pled guilty to amended charges, and he cannot show that the factual bases for his guilty pleas were different from the facts that led to his original convictions at trial. Thus, the district court did not err in determining that based upon his guilty pleas Mashaney was foreclosed from proving at a malpractice trial that he was innocent of the acts for which he was originally convicted. Based upon these determinations, we affirm the ultimate ruling of the district court.

*Facts and Procedural History*

In September 2003, Jason Mashaney was accused of committing indecent sexual acts with his 5-year-old daughter. Mashaney was charged in Sedgwick County with aggravated criminal sodomy and two counts of aggravated indecent liberties with a child. After a preliminary hearing, Mashaney was bound over for trial. The court appointed attorney (now defendant) Sarah Sweet-McKinnon to represent him in the criminal proceedings.

Mashaney's first trial resulted in a mistrial. In July 2004, Mashaney was retried and convicted on all three counts. Mashaney moved pro se for posttrial relief, claiming his trial lawyer had been ineffective. The district court appointed counsel for Mashaney and conducted a hearing on his motion. In November 2004, the district court denied Mashaney's motion, and he was sentenced to prison.

Mashaney appealed his convictions to this court where he was represented by attorney (now defendant) Virginia A. Girard-Brady. In April 2007, this court affirmed Mashaney's convictions, and the Supreme Court declined further review. See *State v. Mashaney*, No. 94,298, 2007 WL 1109456 (Kan. App. 2007) (unpublished opinion), *rev. denied* 284 Kan. 949 (2007).

In April 2008, Mashaney moved for relief under K.S.A. 60-1507 based on ineffective assistance of appellate counsel. The district court denied relief, but in September 2010 our court reversed and remanded for an evidentiary hearing. See *Mashaney v. State*, No. 101,978, 2010 WL 3731341 (Kan. App. 2010) (unpublished opinion). In April 2011, following the mandated evidentiary hearing on Mashaney's motion, the district court set aside Mashaney's convictions. The district court found that due to appellate counsel's deficient performance, Mashaney " ' "was prejudiced to the extent that there is a reasonable probability that, but for counsel's deficient performance, the appeal would have been successful." [Citations omitted.]' *State v. Smith*, 278 Kan. 45, 51-52, 92 P.3d 1096 (2004)." Mashaney's case was placed back on the trial calendar.

In December 2011, in advance of his retrial and pursuant to a plea agreement with the State, Mashaney entered an *Alford* plea of guilty to two counts of attempted aggravated battery and one count of aggravated endangering of a child. See *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). The court accepted his plea and imposed a 72-month prison sentence to be followed by 12 months of postrelease supervision, a sentence that was somewhat less than the time Mashaney had already served on his original conviction. Mashaney was released from custody.

In January 2012, Mashaney commenced this action for legal malpractice against BIDS, Sweet-McKinnon, and Girard-Brady, claiming that on account of their negligent representation in his criminal case he was "forced to serve nearly eight (8) years in prison which would not have occurred had he received proper representation." Mashaney claimed he was innocent of the charges. He alleged that he "adamantly contested the allegations from the very beginning and strongly denies that he ever abused his young daughter."

Mashaney claimed both economic and noneconomic damages. He claimed that when he was arrested he was employed by his stepfather in a home improvement business and that as a result of his wrongful conviction he "lost eight (8) years of wages and development of his career while improperly imprisoned." He also claimed his imprisonment interfered with his relationship with his children as well as with "several family members and friends who passed away while he was in prison."

BIDS moved to dismiss on the grounds that it lacked the capacity to be sued. Sweet-McKinnon answered the petition, claiming that Mashaney was estopped from pursuing this action by the guilty plea he entered in December 2011. In her answer Girard-Brady claimed estoppel and waiver and contended that Mashaney's claim was barred by the 2-year statute of limitations. These defenses came before the court on motions to dismiss and for judgment on the pleadings, which the court granted.

Mashaney's appeal again brings the matter before us.

### BIDS's Capacity to Be Sued

BIDS claims that under the rule expressed in *Hopkins v. State*, 237 Kan. 601, 702 P.2d 311 (1985), as a subordinate government agency BIDS lacks the capacity to be sued. Whether BIDS can be sued is a question of law over which our review is unlimited. See *American Special Risk Management Corp. v. Cahow*, 286 Kan. 1134, 1141, 192 P.3d 614 (2008).

In *Hopkins* our Supreme Court considered whether the Kansas Highway Patrol may be sued. The court ruled that while the State of Kansas may be sued for the acts of its subordinate governmental agencies, the state's subordinate governmental agencies do not in and of themselves have the capacity to sue or be sued in the absence of an authorizing statute. 237 Kan. at 606 (citing *Erwin v. Leonard*, 166 Kan. 630, 203 P.2d 207 [1949]; *Dellinger v. Harper County Social Welfare Board*, 155 Kan. 207, 124 P.3d 513 [1942]; *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 [1981]). The court noted that there are statutes granting the capacity to sue and be sued to the Kansas Turnpike Authority and the Kansas Highway Commission, but there is no such statutory

authority for suits by or against the Kansas Highway Patrol. Thus, the Kansas Highway Patrol may not be sued as an entity. *Hopkins*, 237 Kan. at 606-07.

Here, the Indigents' Defense Services Act, K.S.A. 22-4501 *et seq.*, governs the general functions and responsibilities of BIDS. We note that under K.S.A. 22-4520, BIDS is forbidden to make any decisions regarding the handling of a criminal case to which one of its attorneys is assigned. While lawyers engaged by BIDS to provide legal services to indigent criminal defendants may be subject to civil liability for professional negligence under some circumstances, we find no statute or other authority that grants to BIDS as a separate entity the capacity to sue or be sued. Thus, we conclude that BIDS was properly dismissed from the case.

*Statute of Limitations*

The district court granted judgment on the pleadings to Girard-Brady and Sweet-McKinnon based on Mashaney's failure to commence his malpractice action within the 2-year limitations period found in K.S.A. 60-513(a)(4). The district court determined that the 2-year statute of limitations began to run when it was apparent to Mashaney that his attorneys' malpractice caused him injury, without regard to when he obtained postconviction relief.

We have unlimited review over Mashaney's claim that the district court erred in granting judgment on the pleadings to the lawyer defendants. See *Louisburg Building & Development Co. v. Albright*, 45 Kan. App. 2d 618, 655, 252 P.3d 597 (2011). Further, our unlimited review extends to matters of statutory interpretation, which we have here. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009).

In *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 87, 716 P.2d 575 (1986), the court discussed the four rules for determining the accrual of a cause of action for attorney malpractice: (1) the occurrence rule (when the negligent act occurred), (2) the damage rule (when plaintiff suffers damages), (3) the discovery rule (when the facts giving rise to the claim are discoverable), and (4) the continuous representation rule (when the attorney-client relationship ends).

Under K.S.A. 60-513(b), the applicable statute, Mashaney's legal malpractice claims

"shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party."

Mashaney claims his trial counsel committed malpractice in his criminal trial which resulted in him being wrongfully convicted and wrongfully imprisoned. Looking only to the statute, it would seem that Mashaney's malpractice claim against his trial counsel would have accrued, and the 2-year limitation period would have started to run, in 2004 when he was convicted and sentenced to prison. That is when the fact of injury was reasonably apparent. He did not commence this action until January 2012.

Mashaney also claims his appellate counsel committed malpractice in not raising in his direct appeal issues that could have resulted in a reversal of his convictions. Again looking only to the statute, it would seem that Mashaney's malpractice claim against his appellate counsel would have accrued, and the 2-year limitation period would have started to run, in September 2007 when, after Mashaney's conviction was affirmed by this court, the Supreme Court denied Mashaney's petition for review and the mandate was issued. Mashaney commenced this action more than 2 years after these dates.

It would seem that applying the rules in *Pancake House* to Mashaney's claims, his claims of lawyer malpractice were barred by the 2-year statute of limitations. But, in order to avoid the plain reading of K.S.A. 60-513(b), Mashaney relies on the ruling in *Canaan v. Bartee*, 276 Kan. 116, 72 P.3d 911 (2003), to establish that his causes of action for legal malpractice did not accrue until April 2011 when the district court, ruling on Mashaney's postconviction K.S.A. 60-1507 motion, set aside his conviction and ordered a new trial on account of the ineffective assistance of his counsel. Mashaney commenced this tort action in January 2012, less than a year later.

In *Canaan* our Supreme Court stated: "[W]e adopt the rule that a person convicted in a criminal action must obtain postconviction relief before maintaining an action alleging malpractice against his former criminal defense attorneys." 276 Kan. at 117.

*Canaan* did not involve the statute of limitations. Rather than being asked to decide whether Canaan was too late in commencing his legal malpractice case, the court had to determine whether Canaan commenced his malpractice case too early because his causes of action had not yet accrued.

The timeline in *Canaan* is as follows:

11/95

Canaan is convicted of first-degree murder, aggravated robbery, and aggravated burglary.

1/98

Canaan files suit against his former trial and appellate counsel and against his trial counsel's investigator, asserting various claims including claims of legal malpractice.

7/98

The Kansas Supreme Court affirms Canaan's convictions.

3/02

The defendants move for summary judgment on Canaan's malpractice claims, arguing that Canaan's causes of action had not yet accrued because he had not been exonerated in any postconviction proceedings in his criminal case. The district court grants summary judgment for defendants on Canaan's malpractice claims. Canaan appeals.

9/02

The district court holds an evidentiary hearing on a K.S.A. 60-1507 motion Canaan filed sometime before 3/02. Canaan claims in the motion that he was denied the effective assistance of counsel at his trial. Following this hearing, the district court finds Canaan did not have ineffective counsel at his trial.

On appeal, our Supreme Court adopted the exoneration rule, finding that Canaan was required to be exonerated through post-

conviction relief before he could sue his attorneys for legal malpractice. We pause to note that "exoneration" as discussed in *Canaan* is not the Webster's Dictionary kind, which involves discharging one from legal or moral responsibility. See Webster's Third New International Dictionary 797 (2002). To be exonerated through postconviction relief can consist of having a conviction set aside and a new trial ordered, thereby placing the defendant in continued jeopardy rather than discharging him or her from further criminal proceedings. That is what happened to Mashaney. Further, exoneration is different from actual innocence, as we will discuss later.

The *Canaan* court made no express ruling about how the exoneration rule affects the commencement date for the running of the statute of limitations in a criminal defendant's legal malpractice action. But the *Canaan* court did discuss the interplay between the statute of limitations and the exoneration rule:

> "Canaan also points out that difficulty in applying the statute of limitations has often led courts to reject the exoneration rule. Application of the statute of limitations in legal malpractice cases is troublesome, regardless of the context in which it arises. We have recognized a variety of theories which determine when a cause of action for legal malpractice accrues and when the statute of limitations begins to run and stated that determination of which theory applies depends upon the facts and circumstances of each case. *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 87, 716 P.2d 575 (1986). In *Dearborn Animal Clinic, P.A. v. Wilson*, 248 Kan. 257, 270, 806 P.2d 997 (1991), we recognized that, in some cases, accrual of the cause of action is dependent upon resolution of underlying litigation. Such civil cases would share many of the problems inherent in adoption of the exoneration rule. These problems do not outweigh what we view as the sounder policy and rationale of the exoneration rule." *Canaan*, 276 Kan. at 130-31.

According to Mashaney, this language in *Canaan* about the accrual of a cause of action being dependent upon resolution of underlying litigation teaches that his malpractice claim did not accrue so as to begin the running of the 2-year period of the statute of limitations until he received postconviction relief.

But the district court was not convinced that the *Canaan* court "intended for its adoption of the exoneration rule to establish, by implication, an accrual period for legal malpractice contrary to that set forth in K.S.A. 60-513(b)." Rather, the district court interpreted

*Canaan* as directing that limitations problems created by the exoneration rule be dealt with by the principles discussed in *Dearborn Animal Clinic, P.A. v. Wilson*, 248 Kan. 257, 806 P.2d 997 (1991).

*Dearborn* involved a suit against the plaintiff's lawyer for negligently drafting a sales contract. The timeline for the facts of that case is as follows:

11/85

> The defendant drafts a sales contract for his client, Dearborn Animal Clinic, P.A. The contract was supposed to provide for the sale of stock to be paid through monthly installments.

12/85

> The buyer informs the seller, Dearborn, that he will not purchase the stock and considers the contract as giving him an option to purchase the stock which he chooses not to exercise.
>> (Dearborn suffers damages at this point and the fact of injury is apparent, but it is unclear whether the damages are the result of the attorney's poor drafting of the contract or the buyer's wrongful refusal to honor the contract.)

2/86

> Dearborn, with a new attorney, sues buyer for breach of the contract to purchase the stock.
>> (The suit is based on the premise that Dearborn has a valid contract for the sale of stock and that the buyer has breached the contract.)

6/86

> Dearborn receives interrogatory answers that make it apparent that the sales agreement contained only an option to purchase the stock.
>> (Dearborn now knows that the act that caused its damages from being unable to sell the stock was its lawyer's negligence, not the buyer's wrongful refusal to honor the contract.)

3/87

> District court grants summary judgment to buyer, finding that the contract gave the buyer the option to purchase the stock and the buyer could elect whether to exercise the option.

8/88

> Dearborn sues its attorney for malpractice in drafting the sales contract. The attorney-defendant responds that the claim is barred by the 2-year statute of limitations.

The Supreme Court determined that Dearborn sustained damages in December 1985 when the buyer refused to buy the stock. But it was not apparent to Dearborn that the act causing damages was the defendant's negligent draftsmanship (as opposed to the buyer's refusal to honor the contract) until June 1986. The court concluded that the 2-year statute of limitations started to run in June 1986, and Dearborn's August 1988 suit was 2 months too late.

In so ruling the court noted:

"In a legal malpractice action in which there is underlying litigation which may be determinative of the alleged negligence of the attorney, the better rule, and the one which generally will be applicable under K.S.A. 60-513(b), is that the statute of limitations does not begin to run until the underlying litigation is finally determined. Ordinarily, as long as there is a good faith dispute, a layperson could not reasonably be expected to know that the dispute was caused by his attorney's negligence and the mere filing of an underlying lawsuit would not automatically trigger the running of the statute but would usually require a final determination of such an action. However, the rule that the underlying litigation must be finally determined before the statute of limitations begins to run cannot be arbitrarily applied in every case. If it is clear that the plaintiff in a potential legal malpractice action has incurred injury and if it is reasonably ascertainable that such injury was the result of the defendant attorney's negligence, then under K.S.A. 60-513(b) the statute begins to run at the time that it is reasonably ascertainable that the injury was caused by the attorney's malpractice even though the underlying action may not have been finally resolved." *Dearborn,* 248 Kan. at 270.

In our present case, the district court interpreted these comments from *Dearborn* as "an endorsement of the 'two-track' approach adopted by a number of jurisdictions." The two-track approach is described in *Coscia v. McKenna & Cuneo,* 25 Cal. 4th 1194, 25 P.3d 670 (2001). *Coscia* involved a criminal defendant

who sued his lawyer for malpractice after accepting a plea bargain in his criminal case. The criminal defendant claimed his plea was based on bad advice from his lawyer. The two-track approach described in *Coscia* requires a criminal defendant to bring the malpractice action within the statutory limitation period using traditional standards for determining when the cause of action accrues and without first obtaining relief in postconviction proceedings. But then, according to *Coscia*, the trial court should stay the malpractice action "during the period in which such a plaintiff timely and diligently pursues postconviction remedies." 25 Cal. 4th at 1210-11. Thus, the two tracks are: (1) the new malpractice action which is temporarily stayed, and (2) the old criminal case in which the criminal defendant continues to pursue postconviction relief.

Thus, according to the district court in our present case, Mashaney had to sue his lawyer within the limits discussed in *Pancake House* and then have the malpractice action stayed until he obtained postconviction relief in his criminal case. Because Mashaney did not do so but waited until after he obtained postconviction relief to bring this suit, the district court found that his malpractice action was untimely.

We read *Canaan* differently than did the district court. The court in *Canaan* determined that the district court properly dismissed the plaintiff's malpractice action because it had not yet accrued. As noted earlier, in doing so the *Canaan* court observed that the "[a]pplication of the statute of limitations in legal malpractice cases is troublesome, regardless of the context in which it arises." 276 Kan. at 130. *Dearborn* was one such case. But in the context of a criminal defendant suing defense counsel for malpractice, the Supreme Court concluded: "These problems do not outweigh what we view as the sounder policy and rationale of the exoneration rule." *Canaan*, 276 Kan. at 130-31. Thus, notwithstanding the accrual issue analyzed in the legal malpractice action in *Dearborn*, which related to counsel's performance in a civil matter, when a criminal defendant sues for legal malpractice, that cause of action does not accrue until the defendant has been "exonerated" in postconviction proceedings. "A person convicted in a criminal action must obtain postconviction relief before maintaining an action al-

leging malpractice against his or her former criminal defense attorneys." *Canaan*, 276 Kan. 116, Syl. ¶ 2.

In arriving at our conclusion about when Mashaney's cause of action accrued, the touchstone event for commencing the running of the statute of limitations, we are mindful that at different points in the *Canaan* opinion the court referred to postconviction exoneration as a "prerequisite" or a "precondition." We take this to mean that without exoneration, the cause of action does not accrue. The *Canaan* court addressed this point in response to Canaan's argument that "an exoneration rule violates his constitutional right to seek remedy by court action for harm cause by attorney malpractice":

"[T]he adoption of the exoneration rule could be construed simply as a recognition that a plaintiff has no cause of action until he or she can establish the causation element of his or her claim. In other words, until a plaintiff has been exonerated, his or her criminal conduct and not his or her attorney's negligence is the proximate cause of his or her incarceration. Under this theory, the plaintiff has no cause of action deserving of constitutional protection until exoneration occurs. We find no merit in Canaan's constitutional challenge to the exoneration rule." 276 Kan. at 131.

Mashaney's claims were not barred by the 10-year statute of repose found in K.S.A. 60-513(b): "[B]ut in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action." Under *Canaan*, the conduct of Mashaney's trial and appellate counsel did not mature into actionable claims until Mashaney obtained postconviction relief, and this action was commenced within 2 years thereafter and within 10 years following the conduct giving rise to his claims. Thus, under the principle announce in *Canaan*, Mashaney's claim was brought in timely fashion: not too early, he waited until obtaining postconviction relief; and not too late, he commenced this action within 2 years thereafter and before the bar of the statute of repose.

This approach is consistent with dicta from the federal district court interpreting Kansas substantive law. In *Holmes v. Boal*, No. Civ. A. 04-2591-CM, 2005 WL 2122315 (D. Kan. 2005) (unpublished opinion), Holmes was convicted in 1979 of rape, aggravated burglary, and aggravated kidnapping. In 2003, Holmes obtained

postconviction relief from the Tenth Circuit, which found that Holmes had been denied meaningful counsel because his trial counsel failed to call two alibi witnesses at trial. 2005 WL 2122315, at *1. But the district court determined that Holmes' 2004 malpractice action against his trial lawyer was barred by the 10-year statute of repose found in K.S.A. 60-513(b). In doing so, the court expressed its preference for the two-track approach of *Coscia*, but noted: "When the Kansas Supreme Court adopted the exoneration rule it recognized, by implication, that a legal malpractice claim would not accrue, and the two-year statute of limitations would not begin to run, until exoneration occurred." *Holmes*, 2005 WL 2122315, at *7.

This approach is also consistent with the approach followed by the courts in Iowa, Oregon, Alaska, New York, and Massachusetts. See *Trobaugh v. Sondag*, 668 N.W.2d 577 (Iowa 2003); *Stevens v. Bispham*, 316 Or. 221, 851 P.2d 556 (1993); *Shaw v. State, Dept. of Admin., PDA*, 816 P.2d 1358 (Alaska 1991); *Glenn v. Aiken*, 409 Mass. 699, 569 N.E.2d 783 (1991); *Carmel v. Lunney*, 70 N.Y.2d 169, 511 N.E.2d 1126, 518 N.Y.S.2d 605 (1987).

We conclude that the district court erred in concluding that Mashaney's claim was barred by the 2-year statute of limitations.

*Actual Innocence*

This brings us to the second impediment to Mashaney's malpractice action as determined by the district court: his failure to prove that he was innocent. Because Mashaney entered a guilty plea to amended charges before any retrial could take place, the district court found he would have been unable to establish in his malpractice case that he would have been proven innocent had the retrial of his criminal case gone forward.

Mashaney claims this holding was in error. He argues that in order to proceed with his malpractice case he only needed to show that he was exonerated by having his original conviction overturned and his case remanded for a new trial.

While the court in *Canaan* determined that exoneration, in the form of postconviction relief, is necessary before a criminal defendant may bring a legal malpractice action against defense coun-

sel, the court saved for a later day the question whether actual innocence must also be shown in order to successfully prosecute such an action. 276 Kan. at 132.

We consider this issue in the context of motions to dismiss, which the district court granted. Mashaney's malpractice action was filed in the same district court where he was originally convicted of aggravated criminal sodomy and aggravated indecent liberties with a child. It was also the same court where he ultimately entered an *Alford* plea of guilty to attempted aggravated battery and aggravated endangering of a child. In considering the defendant's motions to dismiss, the district court was entitled to take judicial notice of its own records in Mashaney's criminal case. Ordinarily, when the district court ruling on a motion to dismiss considers matters beyond the face of the pleading, the rules relating to summary judgments apply. K.S.A. 60-212(b)(6). But when matters outside the face of the pleading are proper objects for judicial notice, a motion to dismiss need not be treated as a summary judgment motion. See *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); 5B Wright & Miller, Federal Practice and Procedure: Civil 3d § 1357 (3d ed. 2004).

Our review of the district court's ruling on a motion to dismiss is unlimited. In our review we assume the facts alleged by Mashaney are true, along with any inferences we can reasonably draw from those facts. We then decide whether the facts and inferences state a claim based on Mashaney's theory or any other possible theory. See *Campbell v. Husky Hogs*, 292 Kan. 225, 227, 255 P.3d 1 (2011).

To resolve Mashaney's claim that the district court erred in dismissing his suit for failure to state a claim, we must resolve two questions: (1) does Kansas require that Mashaney prove he was actually innocent of the criminal charges against him in order for him to prevail on his claim of legal malpractice against his former defense counsel; and, if it does, (2) did Mashaney's *Alford* plea make it impossible for him to prove his innocence?

• *Actual Innocence as a Necessary Element*

The element of actual innocence in states that have adopted it requires the plaintiff to establish at trial by a preponderance of the

evidence that he or she was innocent of the charge which formed the basis of the conviction. See *Shaw v. State, Dept. of Admin., PDA*, 816 P.2d 1358, 1360 (Alaska 1991) (*Shaw I*); *Steele v. Kehoe*, 747 So. 2d 931, 933 (Fla. 1999); *Berringer v. Steele*, 133 Md. App. 442, 484, 758 A.2d 574 (2000); *Morgano v. Smith*, 110 Nev. 1025, 1029, 879 P.2d 735 (1994); *Stevens v. Bispham*, 316 Or. 221, 238, 851 P.2d 556 (1993); *Bailey v. Tucker*, 533 Pa. 237, 250-51, 621 A.2d 108 (1993); *Gibson v. Trant*, 58 S.W.3d 103, 117 (Tenn. 2001); *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 497-98 (Tex. 1995); and *Adkins v. Dixon*, 253 Va. 275, 281-82, 482 S.E.2d 797 (1997).

In Kansas, claims of legal malpractice must meet the following requirements:

"[I]n order to prevail on a claim of legal malpractice, a plaintiff is required to show (1) the duty of the attorney to exercise ordinary skill and knowledge, (2) breach of that duty, (3) a causal connection between the breach of duty and the resulting injury, and (4) actual loss or damage." *Bergstrom v. Noah*, 266 Kan. 847, 874, 974 P.2d 531 (1999).

In a legal malpractice action, Kansas applies the " 'but for' rule" of causation discussed in *Webb v. Pomeroy*, 8 Kan. App. 2d 246, 249, 655 P.2d 465 (1983): "But for the negligence of our attorney we would have had a successful result in the (underlying) lawsuit." The *Canaan* court recognized this rule as one which a plaintiff must satisfy. 276 Kan. at 120.

Mashaney was "exonerated" when the court set aside his conviction for committing indecent acts with his 5-year-old daughter and ordered a new trial at which he faced the possibility of another conviction. This type of "exoneration" satisfies the prerequisite identified in *Canaan* for bringing a legal malpractice suit. But exoneration in this sense does not constitute a showing of actual innocence. The court in *Canaan* did not reach the actual innocence issue because it determined that Canaan had not been exonerated, so his cause of action had not yet accrued.

The concept of actual innocence goes beyond the notion of exoneration discussed in *Canaan* and beyond the traditional notion that the plaintiff in a legal malpractice action must show that the

outcome of the criminal case would have been more favorable but for the attorney's negligence. See *Webb*, 8 Kan. App. 2d at 249.

For example, it may be clear that a defendant accused of murder intentionally took the victim's life, but the defendant may have a jurisdictional defense based on the fact that the murder did not occur in the jurisdiction where the defendant was tried. The defendant may be exonerated by an appellate court setting aside the defendant's conviction, and the criminal defendant can rightly claim that the outcome of the case would have been more favorable but for the attorney's negligence, but that hardly constitutes the establishment of actual innocence.

Similarly, a criminal defendant may be caught red-handed in the midst of a burglary. But if the State is dilatory in prosecuting the action, the defendant may have an absolute defense under our speedy trial requirements. If defense counsel failed to raise the speedy trial defense, the criminal defendant may be exonerated when the court later sets aside the conviction because defense counsel was ineffective in not raising this defense. But this clearly does not establish that the defendant was innocent of the charge.

The majority of jurisdictions considering the issue conclude that a criminal defendant bringing a legal malpractice action must show actual innocence. As Chief Judge Posner noted in *Levine v. Kling*, 123 F.3d 580, 583 (7th Cir. 1997), when a criminal defendant is successful in getting his conviction overturned, he can bring a malpractice action against his former defense counsel, "though he will have to prove in that suit by a preponderance of the evidence that he was in fact innocent, and not just lucky."

While not ruling on the actual innocence issue, the court in *Canaan* identified the various states that, having considered the issue, require the criminal defendant in a legal malpractice action to show actual innocence:

### States requiring actual innocence

| Illinois | Alaska* | Nevada |
|---|---|---|
| California | Georgia | Kentucky |
| Massachusetts | Nebraska | New York |
| New Hampshire | Pennsylvania | Texas |
| Virginia | | |

*In Alaska the plaintiff's lack of actual innocence is an affirmative defense to be pled and proven by the malpractice defendant. *Shaw v. State Dept. of Admin.*, 861 P.2d 566, 572 (Alaska 1993).

In discussing policy considerations for adopting the exoneration rule, the court in *Canaan* raised various issues, some of which apply equally to the adoption of an actual innocence requirement. The court stated:

"Various policies or justifications have been stated for the exoneration rule, including: equitable principles against shifting responsibility for the consequences of the criminal action; the paradoxical difficulties of awarding damages to a guilty person; theoretical and practical difficulties of proving causation; . . . preserving judicial economy by avoiding relitigation of settled matters; . . . availability of alternative postconviction remedies; and the chilling effect on thorough defense lawyering. We find many of these stated reasons persuasive." 276 Kan. at 123.

Allowing a legal malpractice claim by a criminal defendant who cannot show actual innocence may create problems similar to permitting a criminal defendant to proceed without exoneration. It may have the effect of shifting the consequences for criminal action from the defendant to the defendant's lawyer and ultimately awarding damages to a criminally guilty party. See *Wiley v. County of San Diego*, 19 Cal. 4th 532, 966 P.2d 983, 79 Cal. Rptr. 2d 672 (1998); *Mahoney v. Shaheen, Cappiello, Stein & Gordon, P.A.*, 143 N.H. 491, 727 A.2d 996 (1999); *Peeler*, 909 S.W.2d at 497-98. As the court stated in *Levine*, 123 F.3d at 582:

"On Levine's view there would be cases in which a defendant guilty in fact of the crime with which he had been charged, and duly convicted and imprisoned . . . would nevertheless obtain substantial damages to compensate him for the loss of his liberty during the period of his rightful imprisonment.

"Not only would this be a paradoxical result, deprecating and in some cases wholly offsetting the plaintiff's criminal punishment, but it would be contrary to

fundamental principles of both tort and criminal law. Tort law provides damages only for harms to the plaintiff's legally protected interests. *Restatement (Second) of Torts*, § 1 comment d, § 7(1) (1965), and the liberty of a guilty criminal is not one of them. The guilty criminal may be able to obtain an acquittal if he is skillfully represented, but he has no right to that result (just as he has no *right* to have the jury nullify the law, though juries sometimes do that), and the law provides no relief if the 'right' is denied him."

Likewise, a criminal defendant who cannot show actual innocence asks the jury in the malpractice action to determine that the defense lawyer at the criminal trial was the cause of the plaintiff's damages, not the plaintiff's own criminal conduct. See *Steele v. Kehoe*, 747 So. 2d 931, 933 (Fla. 1999); *Noske v. Friedberg*, 656 N.W.2d 409, 414 (Minn. App. 2003). See also *Berringe*, 133 Md. App. at 484. As stated in *Shaw*, 861 P.2d at 571, "civil recovery should not be a tool for shifting an individual's responsibility for the individual's criminal acts."

In *Townsend v. Patterson*, No. 104,527, 2011 WL 3658379 (Kan. App. 2011) (unpublished opinion), the plaintiff fired his original defense counsel in his underlying criminal case because of a claimed lack of communication. Townsend then hired private counsel to take over his defense. After Townsend pled no contest to an amended misdemeanor battery charge and completed probation, he sued his original attorney to recover the costs of hiring his retained attorney. The district court held that Townsend's claim was one for legal malpractice and held that Townsend was required to show that he would have obtained an acquittal or dismissal of the criminal charge but for his first attorney's failures. The Court of Appeals, relying on *Canaan*, affirmed, emphasizing the importance of Townsend's guilt or innocence to the success of his claim:

"It is difficult to envisage a scenario in which a plaintiff sues a former criminal defense attorney for breach of a duty imposed by law pursuant to the attorney-client relationship, but the plaintiff's guilt or innocence is not ultimately at issue. Even here, where Townsend's claimed injury is the monetary expense of hiring a second lawyer to perform the job Patterson allegedly neglected, Townsend would not be in the position to need a lawyer at all if not for a criminal charge against him to which he pled no contest. Perhaps Townsend would have a stronger argument in this case had he been exonerated of the charge. But it cannot be said that his guilt or innocence is not at issue in the case." *Townsend*, 2011 WL 365379, at °4.

Actual innocence is different from legal innocence. Many courts have recognized the distinction. See, *e.g.*, *Shaw*, 861 P.2d at 570 n.3. Legal innocence is the State's failure to establish the defendant's guilt beyond a reasonable doubt in a criminal trial. It may also arise when the criminal defendant obtains a favorable ruling from the court that effectively bars the prosecution, such as the exclusion of damning evidence due to improper conduct by the State. We impose the exclusionary rule, for example, " 'to compel respect for the constitutional guaranty in the only effective available way—by removing the incentive to disregard it.' [Citation omitted.]" *Mapp v. Ohio*, 367 U.S. 643, 656, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). We do so to satisfy " 'judicial integrity.' " 367 U.S. at 659. But the California Supreme Court stated: "These and other constitutional protections are to safeguard against conviction of the wrongly accused and to vindicate fundamental values. They are not intended to confer any direct benefit outside the context of the criminal justice system." *Wiley*, 19 Cal. 4th at 541. Thus, a defendant may be legally, but not actually, innocent because of the State's inability to introduce available evidence of guilt, but the *Wiley* court would not permit the criminal defendant to take advantage of that fact in the prosecution of a civil legal malpractice action. It is against California's public policy to permit a criminal defendant who fails to show actual innocence to prevail in a legal malpractice action and thereby profit from the defendant's own criminal conduct by obtaining a money judgment against the criminal defense lawyer which compensates the defendant for the punishment imposed upon him for his criminal conduct. 19 Cal. 4th at 537-38.

To require a showing of actual innocence clearly treats criminal defendants who bring malpractice actions differently than plaintiffs suing their lawyers after less than successful civil disputes. But courts have recognized this as a proper distinction in carrying out a state's public policy. Alaska's public policy, for example, is that "civil recovery should not be a tool for shifting an individual's responsibility for the individual's criminal acts." *Shaw*, 861 P.2d at 571.

The traditional method for trying a legal malpractice case is to conduct a trial within a trial. In trying the malpractice claim the

plaintiff must present evidence to establish that but for defense counsel's negligence, the outcome of the underlying case would have been more favorable. When the plaintiff is a former criminal defendant, the plaintiff should also have to establish actual innocence. California, following the typical scenario, requires the plaintiff "to prove by a preponderance of the evidence" at the trial of the malpractice action that the plaintiff did not commit the charged crime. *Wiley*, 19 Cal. 4th at 545.

Here, Mashaney would have us allow him to obtain a judgment against his defense counsel to compensate him for the time and other losses he claims he suffered from having been convicted of crimes which he very may well have committed.

A survey of the cases considering an actual innocence requirement shows that adopting such a requirement does not satisfy all concerns. Rules based upon public policy seldom do. As a matter of public policy our legislature has created statutes of limitation that prevent the prosecution of stale claims. That public policy arises out of concerns that over time memories fade and witnesses die or move away, thus depriving defendants of an adequate opportunity to defend themselves. Thus, a claim may be commenced today but not tomorrow if the limitation period has run in the meantime, regardless of the clear recollection and availability of all necessary witnesses. Legislators, and courts when called upon to do so in the absence of legislative action, have the ability to refine their response to public policies over time. Such it is with the policy we recognize in Mashaney's case.

The *Canaan* court began its analysis with the following from 3 Mallen & Smith, Legal Malpractice § 26.3, 810 (5th ed. 2000): " 'Today, the courts generally have accepted the principle that guilt or innocence is relevant to pleading and proving a legal malpractice cause of action.' " 276 Kan. at 120. Consistent with that preface, we conclude that in his malpractice action Mashaney must establish that he is actually innocent of the sexual abuse of his 5-year-old daughter which led to his convictions in his underlying criminal case. The district court did not err in so concluding.

• *The Effect of Mashaney's Plea*

Our final issue is whether Mashaney's pleas to the charges of attempted aggravated battery and aggravated endangerment of a child make it impossible for him to prove his actual innocence. Mashaney entered a plea similar to that entered by the defendant in *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

Alford was charged with first-degree murder, a capital crime. The State's evidence against him was quite strong. Faced with the possibility of a death sentence, Alford pled guilty to the reduced charge of second-degree murder and received a 30-year prison sentence. At his plea hearing, Alford denied that he committed the murder but said he was pleading guilty to the reduced charge to avoid the death penalty.

Similarly, Mashaney pled guilty to attempted aggravated battery and aggravated endangering of a child in order to avoid a retrial on the original charges of aggravated criminal sodomy and aggravated indecent liberties with a child, and to avoid being convicted again on those original charges. He also based his plea on the anticipation that he would be sentenced on the amended charges to the time he already served on his prior conviction, thus making him a free man.

In *Alford*, the defendant later sought to set aside his guilty plea because it was the product of fear and coercion. The court noted:

"Thus, while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." 400 U.S. at 37.

The court upheld Alford's guilty plea as constitutional so long as the plea met other constitutional requirements of being made knowingly, voluntarily, and understandingly. 400 U.S. at 37.

In Kansas, an *Alford* plea is similarly characterized as a guilty plea, even though the defendant publicly maintains his or her innocence. See *State v. Case*, 289 Kan. 457, 460-61, 213 P.3d 429 (2009). The Kansas Statutes Annotated state that "[a] plea of guilty

is admission of the truth of the charge *and every material fact alleged therein."* (Emphasis added.) K.S.A. 22-3209(1). Kansas does not distinguish between an *Alford* plea and a guilty plea in terms of their effect on the defendant once he or she enters the plea. See K.S.A. 22-3209(1).

Mashaney argues that his guilty plea does not bar his claim. He relies on the Washington Court of Appeals decision in *Falkner v. Foshaug,* 108 Wash. App. 113, 29 P.3d 771 (2001). In that case, a jury convicted Falkner of second-degree murder for the death of his wife. After his conviction, Falkner moved for a new trial based on ineffective assistance of counsel. The district court denied Falkner's motion, but an appellate court found that Falkner's argument had merit and vacated Falkner's conviction and remanded the case for a new trial. 108 Wash. App. at 115.

While the second trial was in progress, the State offered to end the matter if Falkner agreed to plead to the lesser-included charge of first-degree manslaughter. Falkner accepted the deal and entered an *Alford* plea, maintaining that he was innocent of the crime. The district court accepted Falkner's plea and sentenced him to less time than he had already served on the original charge, so Falkner was immediately released. Falkner then sued his first defense attorney for legal malpractice. Defendant Foshaug moved for summary judgment, arguing that Falkner's plea precluded his claims. The district court granted Foshaug's motion.

The Washington Court of Appeals reversed, finding that Falkner's *Alford* plea did not preclude his action against Foshaug. The *Falkner* court recognized that one of the key conflicts in allowing a legal malpractice suit by a defendant adjudged guilty of the crime is that the defendant may be found guilty in criminal court, where the burden of proof is much higher, but innocent in civil court with its lower preponderance standard. The *Falkner* court stated that because Falkner maintained his innocence of his wife's death, there was no problem created if Falkner were to succeed in his malpractice action and be adjudged innocent in civil court. 108 Wash. App. at 125.

Washington is the only state that appears to take this view. In fact, the *Falkner* court recognized that other jurisdictions have taken the opposite view. See *Falkner,* 108 Wash. App. at 125.

Although Mashaney urges this court to follow *Falkner*, the law in Kansas dictates that we do otherwise. Our Supreme Court has held that "[a] plea of guilty to a charge is an admission of *an act which was the basis for that charge*. When relevant, the plea of guilty to that charge may be admitted into evidence in a subsequent civil action as an admission of the act charged." (Emphasis added.) *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 711, 732 P.2d 741 (1987). Here, Mashaney pled guilty when entering his *Alford* plea. See *Case*, 289 Kan. at 460-61. Kansas recognizes *Alford* pleas but does not distinguish them in practice from a guilty plea. See K.S.A. 22-3209(1).

Mashaney pled guilty to the charges of attempted aggravated battery and aggravated endangering of a child. He is precluded from recovering damages for legal malpractice if, as we have now determined, he is unable to prove actual innocence. In the context of this case, this would require Mashaney to be able to prove to the jury in his malpractice case that he did not commit the indecent acts with his 5-year-old daughter, which led to his convictions at trial.

Mashaney was originally charged and convicted of one count of aggravated criminal sodomy and two counts of aggravated indecent liberties with a child. The victim was his 5-year-old daughter. We do not have in the record a copy of the criminal complaint in that case. We do not know the date or dates when the State charged these crimes were committed.

After his convictions were set aside and a new trial was ordered, the State and Mashaney entered into a plea agreement which is a part of the record. Pursuant to that agreement, Mashaney agreed to enter an *Alford* plea of guilty or a plea of nolo contendere to the following:

"Count 1: as amended, Attempted Aggravated Battery, severity level 6, person felony, in violation of K.S.A. 21-3301 & 21-3414(a)(1)(A).

"Count 2: as amended, Attempted Aggravated Battery, severity level 6, person felony, in violation of K.S.A. 21-3301 & 21-3414(a)(1)(A).

"Count 3: as amended, Aggravated Endangering of a Child, a severity level 9 person felony, in violation of K.S.A. 21-3608a."

At the plea hearing, Mashaney entered *Alford* pleas of guilty rather than pleas of nolo contendere.

The elements of attempted aggravated battery and aggravated endangering of a child are distinctly different from the elements of aggravated criminal sodomy and aggravated indecent liberties with a child.

Mashaney was originally charged with and convicted of aggravated sodomy and aggravated indecent liberties with a child. Following the preliminary hearing, Mashaney was bound over for trial on "aggravated criminal Sodomy with a child < 14 yoa." According to the journal entry of judgment, he was convicted under K.S.A. 21-3506(a)(1) which simply provides: "(a) Aggravated criminal sodomy is: (1) Sodomy with a child under 14 years of age."

Mashaney was also bound over for trial on two counts of "Aggravated indecent liberties w/child; < 14 yoa; Lewd fondling/ touching." According to the journal entry of judgment, he was convicted under K.S.A. 21-3504(a)(3)(A), which provides:

"(a) Aggravated indecent liberties with a child is:

. . . .

"(3) engaging in any of the following acts with a child who is under 14 years of age:

"(A) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both."

The elements of the crimes to which Mashaney entered his *Alford* plea are as follows:

Counts 1 and 2: K.S.A. 21-3301 is the attempt statute, and it describes an attempt as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing the crime." K.S.A. 21-3414(a)(1)(A) defines aggravated battery as: "Intentionally causing great bodily harm to another person or disfigurement of another person."

Count 3: K.S.A. 21-3608a defines aggravated endangering of a child. The definition includes a variety of acts and circumstances. Because the journal entry of judgment does not specify which subsection applies, we generally describe them as:

(1) Intentionally causing/permitting a child under age 18 to be in a situation in which the child's life, body, or health is injured or endangered;

(2) Recklessly causing/permitting the situation described in (1);

(3) Causing/permitting such a child to be where methamphetamine is manufactured or sold; or

(4) Causing/permitting such a child to be where methamphetamine paraphernalia or volatile, toxic, or flammable methamphetamine chemicals are stored.

We do not know whether the acts Mashaney admitted occurred on the same dates as the acts for which he was convicted at trial. It would seem that based upon the very nature of the charges to which Mashaney pled guilty, his pleas may not have been to the same acts for which he was originally convicted.

But on appeal, the defendants contend that Mashaney entered his guilty plea based upon the same conduct for. which he was originally convicted at trial. In his reply brief, Mashaney discusses his *Alford* plea, but he does not deny that his *Alford* plea was based on the same criminal conduct for which he was originally convicted at trial. Mashaney has not included in the record on appeal the transcript of the plea hearing that followed this plea agreement. Thus, we do not know whether Mashaney admitted to the same facts that formed the basis for his earlier convictions at trial. Mashaney claims the district court erred in determining that he could not prove his actual innocence. That might be true if we knew that the factual basis for Mashaney's *Alford* plea was different than the factual basis for his original convictions. Mashaney has the burden of providing a record on appeal that demonstrates the trial court's error. If he did not admit to the same underlying facts that supported his earlier conviction, he may have a basis for attacking the district court's ruling. But having failed to provide a record that would support any such argument, this claim of error fails. See *State v. McCullough*, 293 Kan. 970, 999, 270 P.3d 1142 (2012).

In conclusion, we have determined that Mashaney's cause of action against his former defense counsel for legal malpractice accrued, for the purpose of calculating the beginning date for the running of the 2-year statute of limitations under K.S.A. 60-513, when Mashaney was "exonerated" in postconviction proceedings which resulted in setting aside his convictions and ordering a new trial. In this regard, the district court erred in concluding that Mas-

haney's malpractice action was untimely based upon the causes of action having accrued at an earlier date.

But we also determined that in order to prevail at trial, Mashaney must be able to demonstrate that he was actually, not merely legally, innocent of the charges for which he was convicted. Mashaney entered an *Alford* plea of guilty to amended charges before the court-ordered retrial. Mashaney does not contend that the charges to which he entered his *Alford* plea were based on facts that were different from the facts that supported his original conviction. Thus, he cannot establish that he was actually innocent of the original charges which led to his convictions for sexually abusing his daughter. Without such a showing, Mashaney cannot prevail in this malpractice action and, therefore, the district court did not err in dismissing his claim on this basis.

Affirmed.

\* \* \*

ATCHESON, J., concurring in part and dissenting in part:

## I. An Overview

The difficult issue in this case asks how the demonstrable negligence of a lawyer representing a criminal defendant should be remedied through civil tort law. Based on vaporous public policy considerations, most courts addressing the issue require criminal defendants to prove they are "actually innocent" to win legal malpractice claims—an obligation that has no real analog when civil litigants sue their lawyers for negligent representation and no real connection to the harm inflicted. The duty criminal defense lawyers owe their clients has both a constitutional dimension rooted in the right to counsel and an individual dimension rooted in the nature of the professional relationship. If a breach of that individual duty has caused a client to be convicted rather than acquitted, traditional malpractice law would afford that client, without regard to guilt or innocence, a tort remedy against the lawyer. I have tried unsuccessfully to discern genuine public interests served through an actual innocence rule and the deformation it inflicts on professional malpractice law. I, therefore, respectfully dissent from that

part of the majority decision adopting such a rule. In this case, I would reverse and remand Jason Mashaney's legal malpractice action for further proceedings, subject to some significant limitations.

The justifications offered in the caselaw for imposing an actual innocence requirement have been stated briefly and, for the most part, without much explanation. See, e.g., *Levine v. Kling*, 123 F.3d 580, 582 (7th Cir. 1997) (substantive discussion presented in five comparatively short paragraphs); *State ex rel. O'Blennis v. Adolf*, 691 S.W.2d 498, 503 (Mo. App. 1985) (declaring without citation or explanation that "factual innocence" is "an indispensable element" of criminal defendant's legal malpractice claim); *Carmel v. Lunney*, 70 N.Y.2d 169, 173, 511 N.E.2d 1126, 518 N.Y.S.2d 605 (1987) (public policy considerations discussed in single paragraph); but see *Wiley v. County of San Diego*, 19 Cal. 4th 532, 966 P.2d 983 (1998) (court offers more extended analysis supporting actual innocence rule but relies on *Levine* in key respects; some of its stated concerns arise even with the rule in place). The early cases pronounced the rule necessary to promote those public policies, and the later cases commonly have unreflectively reiterated that pronouncement with citations to those initial decisions. See, e.g., *Kramer v. Dirksen*, 296 Ill. App. 3d 819, 821-22, 695 N.E.2d 1288 (1998); *Humphries v. Detch*, 227 W. Va. 627, 633, 712 S.E.2d 795 (2011).

Mashaney's circumstances present two complicating factors. First, the underlying sex crime charged, if true, would be especially repugnant. Though not explicitly stated in the caselaw, the courts adopting an actual innocence rule seem to recoil at the notion a person who may have committed a heinous offense ought to be able to bring a civil action for legal malpractice. But a person's moral culpability for bad acts typically does not otherwise extinguish the legal liability of professionals providing substandard services to that person, even when those acts necessitate the services. Second, after being granted a new criminal trial, Mashaney entered an *Alford* plea to less serious (and less repugnant sounding) felony charges for the same alleged conduct and was adjudged guilty. How to factor that plea into his legal malpractice action with or without an actual innocence rule isn't easy.

Those complexities are redoubled because the essential legal requirements for criminal defendants to successfully sue their lawyers for malpractice extend beyond this case and must foster fair results in different cases. That is, the rule laid down here will govern the cause of action generally. As the majority suggests, it may be next to impossible to fashion requirements achieving that objective for every permutation. But including actual innocence as a criterion ill serves basic fairness in that persons who have served lengthy prison sentences as a direct result of their lawyers' negligence will be deprived of any tort remedy for that malpractice and some lawyers representing criminal defendants will escape liability when their civil counterparts would not.

In short, the actual innocence rule detrimentally distorts the law in ways disadvantaging criminal defendants suffering tangible harm because of their lawyers' incompetence, leaving injuries unredressed that the tort system would otherwise compensate. Rejecting that rule would better serve the true public policies embodied in the criminal justice process and in civil tort law. The requirement adopted in *Canaan v. Bartee*, 276 Kan. 116, 131-32, 72 P.3d 911 (2003), that criminal defendants obtain relief under K.S.A. 60-1507 before filing legal malpractice actions—thereby establishing both that their lawyers had provided representation falling below the constitutional standard of adequacy and that they had been materially prejudiced as a result—sufficiently guards the public interest in keeping plainly undeserving litigants from clogging the civil system with frivolous suits.

Before elaborating on why the actual innocence rule should be rejected, I mention the points on which I agree with the majority. First, the Board of Indigents' Defense Services, as a subordinate state agency, is not a proper defendant. I offer no opinion on whether the State could now be substituted for the Board or named in an amended petition. That concern is moot, since the majority rejects Mashaney's cause of action against any potential defendant. Second, Mashaney's malpractice action was timely filed under the 2-year statute of limitations in K.S.A. 60-513. In *Canaan*, 276 Kan. at 131-32, the court held that a criminal defendant must win a 60-1507 motion vacating his, or her conviction to bring a legal mal-

practice action based on that conviction. Accordingly, a cause of action for legal malpractice does not accrue until the criminal defendant has prevailed on a 60-1507 motion. Measured that way, Mashaney's malpractice action was filed within the limitations period.

## II. ACTUAL INNOCENCE ELEMENT DISTORTS MALPRACTICE LAW

As the majority notes, the elements of a legal malpractice claim typically have been stated as requiring proof that the lawyer owed the party claiming injury a duty to use ordinary professional skill or knowledge and a breach of that duty causing the party a material loss or damage. *Bergstrom v. Noah*, 266 Kan. 847, 874, 974 P.2d 531 (1999). When the malpractice rests on a claim the lawyer botched litigation, the party must show he or she would have obtained "a favorable judgment in the underlying lawsuit had it not been for the attorney's error." *Canaan*, 276 Kan. at 120; *Webb v. Pomeroy*, 8 Kan. App. 2d 246, 249, 655 P.2d 465 (1983). The actual innocence rule adds an element to a malpractice claim against a criminal defense lawyer that has no direct counterpart when the claim arises from failed civil litigation. And it materially recasts the "favorable judgment" standard to substantially disadvantage criminal defendants suing their former lawyers.

The distorting effects may be better illustrated in an example uncluttered by Mashaney's *Alford* plea. I offer that example as the model for discussing the phony public policy interests cited in favor of an actual innocence rule. I then look at variations on that paradigm, including the circumstances Mashaney presents. Suppose a jury convicts a defendant of robbery for punching the victim and grabbing his or her iPod, and the judge imposes a midrange guidelines sentence of 120 months in prison because the defendant already had two convictions for felony theft. This court affirms the robbery conviction on direct appeal. The Kansas Supreme Court denies the defendant's request for review. The defendant then files a 60-1507 motion collaterally attacking the conviction based on the ineffective assistance of trial counsel. The district court denies the motion, and the defendant appeals. This court finds the lawyer was constitutionally deficient in a way that prejudiced the defendant's

right to a fair trial and grants the defendant a new trial. In due course, the Kansas Supreme Court denies the State's petition for review. By that time, the defendant probably has been in prison for more than 60 months or 5 years—a fairly conservative estimate. The defendant again goes to trial on the robbery charge with a different lawyer. The jury finds him not guilty, and he is released from custody. The defendant then sues the lawyer who represented him in the first trial for legal malpractice.

In that scenario, the criminal defendant enters the legal malpractice action having shown to the satisfaction of the courts in the 60-1507 proceeding that his lawyer breached a constitutional duty of adequate representation and, in so doing, rendered the first criminal trial fundamentally unfair and having secured in the second criminal trial a jury verdict of not guilty. So in the second trial, the criminal defendant arguably received the favorable judgment he should have received in the first trial. Had the criminal defendant been acquitted in the first trial, he would not have spent 5 years in prison. By any reasonable definition, 5 years of wrongful imprisonment looks to be an injury or harm.

Under the traditional elements of a legal malpractice action, that criminal defendant ought to get a day in court to prove a civil claim for damages against the lawyer representing him in the first trial. Whether the criminal defendant would prevail or not is another matter. The actual innocence rule, however, imposes an extraordinary legal hurdle that would defeat many claims at the pleading stage or on summary judgment and likely would keep many others from being filed at all. Even at trial, the rule would impose a formidable barrier to otherwise meritorious claims. Proving actual innocence is far different from and far more difficult than showing that a criminal defendant would have been found not guilty—the ultimate "favorable judgment" in a criminal case. The courts adopting the rule invoke a variety of public policy interests to justify that barrier.

Although courts are not to examine the wisdom of the policy considerations animating statutes, since that would impermissibly intrude upon the province of the legislature, they should explain themselves when they invoke policy in fashioning common-law

rights and duties. Because the actual innocence rule alters a common-law cause of action—a judicially created claim for professional negligence—the courts adopting it in the name of public policy have an obligation to clearly state in a fairly comprehensive manner their reasoning. The failure to do so both abdicates judicial responsibility and obscures the rationale behind the policy, rendering its wisdom suspect.

## III. Contrived Public Policies Don't Support Actual Innocence

*Seventh Circuit's No Right to Acquittal Misstates the Law*

A panel of the United States Court of Appeals for the Seventh Circuit laid down a cornerstone argument for the actual innocence rule in *Levine*, so I begin there. The panel reasoned that a criminal defendant who is, in fact, guilty has "no right" to an acquittal in a criminal prosecution and, therefore, can assert no "legally protected interest" compromised in his or her loss of liberty upon conviction. *Levine*, 123 F.3d at 582. In turn, that defendant cannot base a legal malpractice claim on the incompetence of his or her lawyer, even if that poor representation rendered the trial unfair and the verdict vulnerable on collateral attack. The criminal defendant's resulting incarceration would not be a compensable injury. According to the *Levine* panel, a criminal defendant bringing a legal malpractice claim must prove he or she is factually innocent to establish the incompetent trial lawyer breached a protected duty and caused actionable harm. 123 F.3d at 582-83. The premise is wrong and the reasoning misguided.

A criminal defendant has a fundamental right to be proven guilty beyond a reasonable doubt grounded in the due process protections of the Fifth and Fourteenth Amendments to the United States Constitution. *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). And if the government fails to meet that burden in a given prosecution, the defendant should go free. The right belongs to anyone charged with a crime—guilty or innocent. See 397 U.S. at

363 ("The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure."); 397 U.S. at 364 ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). So to say someone who actually has committed a crime has no right to be found not guilty if the government fails to establish guilt beyond a reasonable doubt is simply incorrect.

By the same token, criminal defense lawyers owe a duty to their clients to hold the government to its burden of proof and to test the government's case to highlight reasons jurors might doubt the evidence satisfies that constitutional standard. Those lawyers owe a qualitatively indistinguishable performance of that duty to clients they know or suspect are guilty and to clients they know or suspect are innocent. An incompetent performance is no less so because it has been rendered in the service of a defendant who may, in fact, be guilty. In any given case, the lawyer's breach of that duty can result in the conviction and imprisonment of someone who ought to have been acquitted. At least under the standard rules for legal malpractice suits, the client would have an actionable claim against the lawyer for the harm caused by that outcome, including the period of incarceration.

Incorporating an actual innocence element into criminal malpractice claims doesn't directly alter those principles. The rule simply divides the factually guilty from the actually innocent for purposes of bringing malpractice claims when they are otherwise similarly situated legally—both had a right to an acquittal in the criminal action if the government could not marshal sufficient evidence to convict, and both were owed a duty of competent representation by their lawyers. And both could otherwise seek damages in malpractice actions when the breach of that duty resulted in an unfair criminal trial, an improper conviction, and a loss of liberty.

Tort law provides a remedy—typically money damages—to Jones when Smith invades a statutory or common-law right of Jones or violates a statutory or common-law duty owed Jones, thereby causing injury to Jones. See *Estate of Belden v. Brown County*, 46

Kan. App. 2d 247, 269, 261 P.3d 943 (2011). In professional negligence actions, the moral blameworthiness of the injured party seeking relief doesn't bar a claim. Thus, a person shot by police while robbing a bank may bring a medical malpractice action against the surgeon negligently removing the bullet rendering that person a paraplegic. The physician's duty of care isn't legally reduced or extinguished because the patient came to be injured through his or her own fault or criminal wrongdoing.

But the actual innocence rule injects moral blame into legal malpractice law with odd results. For example, a person gets in a fight outside a bar and hits and seriously injures another patron. The person is prosecuted for intentional aggravated battery, and the victim sues civilly for damages. So the person hires one lawyer to defend him in the criminal prosecution and a second lawyer to handle the civil suit. Each performs horrendously. The civil defense lawyer fails to assert a winning statute of limitations argument based on the 1-year period for bringing battery actions, and the jury returns a judgment in the mid-six figures. See K.S.A. 60-514(b). The criminal defense lawyer doesn't file a motion to suppress his client's highly incriminating statements given to a detective in a custodial interrogation without *Miranda* warnings. When the State can't find the only independent witness to the fight, those statements become the decisive part of the prosecution case at trial, given the victim's shaky identification. The jury convicts, and the individual receives a 41-month sentence. He loses his direct appeal but has the conviction set aside on habeas review. In the retrial, with new lawyer and without the incriminating statements, he is found not guilty.

With an actual innocence rule in place, the individual could sue his civil lawyer for malpractice and, in this scenario, likely win, recovering the amount of the judgment entered against him. But he would not have a viable claim against his criminal defense lawyer for damages based on the time he spent in prison. The result is, as I have said, peculiar in creating markedly different malpractice standards for civil practitioners and criminal practitioners. In the example, the client is equally blameworthy in both the civil and criminal cases. Yet, moral blameworthiness (lack of proof of actual

innocence) would extinguish the criminal malpractice action but not the civil one. The rule effectively diminishes the potential liability of criminal defense lawyers even though they are duty-bound to protect their clients' liberty interests, something that typically would be viewed as more valuable than the money damages commonly at stake in civil proceedings.

More peculiarly, perhaps, the rule also divides criminal defense practitioners for malpractice purposes based not on fulfillment of their legal duties but on the culpability of their clients. With an actual innocence rule, a criminal defense lawyer representing a guilty client is essentially granted immunity from civil liability for even the most egregious errors. Critics of the rule point out the illogic of that division, see *Wiley*, 19 Cal. 4th at 547-48 (Mosk, J., dissenting), and at least some proponents of the rule acknowledge it, see *Glenn v. Aiken*, 409 Mass. 699, 705, 569 N.E.2d 783 (1991).

Some, if not many, actually innocent criminal defendants would be unable to affirmatively prove their innocence by a preponderance of evidence in a malpractice action. They, too, would be deprived of a civil remedy for demonstrable lawyer incompetence leading to legally improper convictions. Similarly, depending on how "actual innocence" is construed, a criminal defendant convicted of a serious offense would be deprived of a civil remedy even though competent counsel would have effectively marshaled evidence likely producing a conviction for a substantially lesser offense and a significantly shorter period of incarceration. The West Virginia Supreme Court recently held that in a legal malpractice action, the criminal defendant must prove his or her actual innocence not only of the crime charged but any lesser offenses. *Humphries*, 227 W. Va. at 633. For example, a criminal defendant convicted of first-degree murder in Kansas receives a life sentence with no consideration for release for at least 25 years. If, however, a competently presented defense likely would have yielded a conviction for involuntary manslaughter based on a self-defense theory, a defendant with a clean record ought to receive a standard grid sentence of 32 months and would be a border-box candidate for probation. See *State v. O'Rear*, 293 Kan. 892, 901, 270 P.3d 1127 (2012) (unintentional killing resulting from use of excessive force

in otherwise lawful act of self-defense constitutes involuntary manslaughter rather than murder); *State v. Pennington*, 43 Kan. App. 2d 446, 461, 227 P.3d 978 (2010). But that person would have no civil cause of action against the criminal defense lawyer whose incompetence led to his or her incarceration for years during the appellate challenges to the wrongful murder conviction.

*Differences Between Civil and Criminal Law Do Not Support Actual Innocence Rule*

Some proponents of the actual innocence rule argue the differences between the civil and criminal justice processes commend the rule. See *Wiley*, 19 Cal. 4th at 541-44. Again, the notion is misguided and gives short shrift to the individualized duty criminal defense lawyers owe their clients.

The criminal justice system protects broad societal interests in punishing individuals who violate statutory proscriptions against violent and otherwise especially deleterious behavior. The criminal, thus, inflicts an injury on the citizenry as a whole to be redressed with punitive sanctions, often including incarceration. Hence, a criminal case goes forward at the direction of and in the name of the government, and the individual victims directly harmed cannot call off that prosecution. Conversely, the civil justice system largely aims to vindicate individual rights by providing mechanisms to remedy breaches of contractual arrangements and to award compensation for commercial wrongs and physical injuries. Civil law is concerned with compensatory relief, not punishment. Given those differing objectives, the California Supreme Court, for example, has suggested it is simply "unjust" to allow a factually guilty criminal defendant to bring a malpractice claim against his or her lawyer. *Wiley*, 19 Cal. 4th at 539 ("While a conviction predicated on incompetence may be erroneous, it is not unjust."). But that confuses the overarching purpose of the criminal courts with the much narrower duty at issue in any legal malpractice claim—the obligation of the lawyer to provide competent representation to his or her client. Ultimately, that obligation is a personal one between lawyer and client, the violation of which historically gives rise to civil liability if the professional incompetence results in harm. As I

have said, that personal duty binds a criminal defense lawyer to his or her client regardless of the client's guilt or innocence. Accordingly, tort law ought to afford a remedy for a violation of that particularized duty whether the lawyer's dereliction inflicts an injury in a criminal prosecution or a civil case.

Advocates for an actual innocence element point out that the civil judicial process simply does not grant new trials to parties incurring bad results because of their lawyers' negligence. Their sole remedy lies in malpractice actions against those lawyers for money damages. But that seems to border on a non sequitur in arguing for an actual innocence requirement. A criminal defendant's right to a new trial based on lawyer incompetence vindicates a societal interest in depriving a person of liberty only if he or she has had a fair trial and, in doing so, protects a constellation of constitutional rights bound up in that process. No similarly compelling systemic interest attaches to civil proceedings because no similarly compelling interest—liberty—may be lost in an adverse civil judgment.

They also say that a new trial affords criminal defendants sufficient relief for lawyer malpractice unless those defendants can prove their actual innocence. See *Wiley*, 19 Cal. 4th at 542; *Mahoney v. Shaheen, Cappiello, Stein & Gordon*, 143 N.H. 491, 496, 727 A.2d 996 (1999). But neither the societal interest in punishing only those criminal defendants receiving fair trials nor the availability of a 60-1507 remedy furthering that interest offers full relief for breach of the personal duty a lawyer owes a client—the actual interest directly at issue in a professional negligence case. A complete tort remedy for the violation of a lawyer's duty to a criminal defendant client resulting in an unfair trial and an unwarranted conviction entails compensation for the deprivation of liberty between the conviction and its reversal. The remedy for that harm can only come through a legal malpractice action against the lawyer whose incompetence led to the conviction. The traditional elements for malpractice actions appropriately afford that remedy, since the duty, the breach, and the harm befall the criminal defendant without regard to guilt or actual innocence.

*Misapplying Tort Law to Promote Actual Innocence Requirement*

The advocates for an actual innocence rule invoke "but for" causation to deprive criminal defendants of any relief in legal malpractice actions. See, *e.g.*, *Wiley*, 19 Cal. 4th at 540. In other words, unless the defendant is truly innocent, the root cause of his or her incarceration is the commission of the criminal act rather than the incompetent lawyering leading to the guilty verdict. The reasoning, however, rests on a rigid application of but for causation inconsistent with general tort law principles. Tort law looks to proximate cause to impose liability so that a later negligent act may supersede earlier wrongful conduct in establishing compensable fault. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 420-21, 228 P.3d 1048 (2010). In a tort action, the injured party (here, the convicted criminal defendant) must show that "but for" the conduct of the party breaching the duty owed (here, the incompetent criminal defense lawyer) the actionable harm (here, the incarceration) would not have occurred. 290 Kan. at 420. That reflects a determination of proximate cause. If the lawyer handling the criminal case fails to demonstrate the State's inability to prove guilt beyond a reasonable doubt when a competent lawyer could have and would have done so, the client has been legally injured by being convicted and imprisoned. That is true whether the client was actually innocent or not. The client's guilt did not bring about or cause the harm, and the harm would have befallen an actually innocent person in the same circumstances. So the client's commission of a crime is not really a direct cause of the legal injury. The other aspect of proximate cause requires that the harm be a foreseeable consequence or result of the negligent conduct. 290 Kan. at 421. That is a given here. Plainly, a criminal defense lawyer can foresee that a product of his or her incompetent representation may be the conviction of the client despite the State's inadequate evidence.

As I have already suggested, professional negligence actions typically conform to that model. Skilled professionals are not immunized against the consequences of negligent performance of their duties simply because parties obtain those services as the result of

their own negligent conduct or intentional wrongdoing. Tort law carves out no such exception for physicians or lawyers representing clients in civil actions. Creating an exception for criminal defense lawyers with guilty clients seems analytically arbitrary, reflecting not so much a sound application of tort law as a deviation from it to prevent a class of disfavored individuals from pursuing legal malpractice claims.

The advocates for an actual innocence rule argue that without it, guilty criminal defendants would profit from their own wrongs if they can successfully sue their lawyers for malpractice. *Wiley*, 19 Cal. 4th at 537-38; *Mahoney*, 143 N.H. at 496. The law acknowledges an aphorism that a party should not benefit from his or her own wrongful conduct. And it may be invoked in all sorts of contexts. See *Giles v. California*, 554 U.S. 353, 365-68, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008) (noting maxim in discussing relaxation of rules on admission of out-of-court statements when party has deliberately procured the absence of an adverse witness); *McCaffree Financial Corp. v. Nunnink*, 18 Kan. App. 2d 40, 55-56, 847 P.2d 1321 (1993) (noting maxim but declining to apply it to prevent defendant from asserting statute of limitations bar to plaintiff's suit for misuse of trade secrets); *Estate of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011) (relating maxim to equitable estoppel and fraudulent concealment). But jurisprudence resting on generic sayings is distinctly airy, as this argument illustrates.

A criminal defendant successfully suing his or her lawyer for negligence based on a conviction and the resulting incarceration isn't profiting from his or her underlying crime. He or she is being compensated for a legal injury—a loss of liberty—directly resulting from the lawyer's malpractice in failing to obtain a favorable result for the client in the criminal prosecution. That's not profiting any more than a person injured in a motor vehicle collision "profits" from a damage award for the harm he or she has suffered. By contrast, Henry Hill quite arguably profited from his crimes to the extent he was paid for assisting in the preparation of "Wiseguy: Life in a Mafia Family," a biography about his mob career, and its cinematic dramatization in "Goodfellas." See *Simon & Schuster,*

*Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991).

Proponents of the rule contend that private lawyers will not take on paying clients accused of crimes or agree to serve on panels providing representation to indigent criminal defendants without the protection of an actual innocence rule. *Glenn*, 409 Mass. at 707-08; *Mahoney*, 143 N.H. at 496. They say the risk and consequences of malpractice actions from disaffected criminal clients would drive away lawyers. The fear is wholly speculative and entirely unsupported with any empirical data. If the concern were real, I would expect to see too few lawyers handling criminal cases in those states that treat criminal and civil malpractice actions the same, such as Indiana and Ohio. See *Godby v. Whitehead*, 837 N.E.2d 146, 151 (Ind. App. 2005); *Krahn v. Kinney*, 43 Ohio St. 3d 103, 105, 538 N.E.2d 1058 (1989). But the crisis does not appear to have materialized.

Moreover, Kansas, among other states, requires that a criminal defendant prevail on a 60-1507 motion before even filing a legal malpractice action. *Canaan*, 276 Kan. at 132. The criminal defendant, therefore, must effectively prove to a court that his or her lawyer performed incompetently and that incompetence rendered the criminal case and resulting conviction demonstrably unfair. See *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985). In fiscal 2012, for example, the Kansas district courts granted relief to less than 4 percent of the convicts challenging their convictions through 60-1507 motions. See Annual Report of the Courts of Kansas for Fiscal Year 2012, at 4 (2013). That effectively precludes convicted criminal defendants from pursuing malpractice claims based on insubstantial allegations of incompetent legal representation. A criminal defendant filing a legal malpractice action without having secured relief on a 60-1507 motion would face prompt dismissal on a motion on the pleadings. See K.S.A. 60-212(b)(6), (c). An actual innocence rule, therefore, is unnecessary to combat a doubtful plague of frivolous criminal malpractice actions.

*Actual Innocence Rules Would Not Simplify Malpractice Litigation*

Courts favoring an actual innocence element in criminal malpractice actions, notably the California Supreme Court in *Wiley*, suggest those cases would otherwise be exceptionally difficult to adjudicate. Although legal malpractice actions arising out of criminal prosecutions present some challenging litigation issues, as I discuss, an actual innocence rule doesn't directly resolve those challenges for the most part. They persist in any given malpractice action. With an actual innocence rule in place, there simply will be fewer malpractice actions litigated.

Without an actual innocence element, jurors hearing the malpractice action presumably would first consider whether the criminal defense lawyer's representation fell below the required standard of professional competence. If so, they would then have to decide causation. On that score, the *Wiley* court suggests those jurors essentially would be instructed to determine by a preponderance of the evidence whether but for the lawyer's incompetence the jury in the criminal case would have found the defendant guilty beyond a reasonable doubt. 19 Cal. 4th at 544. The verbiage might vary some in an actual jury instruction, and the operative legal concepts would be explained. But that more or less seems to capture the issue. The *Wiley* court concluded jurors would be utterly flummoxed: "The mental gymnastics required to reach an intelligent verdict would be difficult to comprehend much less execute." 19 Cal. 4th at 544. I don't share the California Supreme Court's dim view of jurors' acuity individually or collectively as a deliberative body. Courts commonly entrust immensely complex issues to jurors, as antitrust or groundwater contamination suits illustrate. See *MTBE Products Liability Litigation*, 725 F.3d 65, 78-80 (2d Cir. 2013) (groundwater contamination); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 824 (3d Cir. 2010) (antitrust); *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 532-34 (6th Cir. 2008) (antitrust).

The principal complicating factor, according to the *Wiley* court, lies in the differing burdens of proof at play in the malpractice action. 19 Cal. 4th at 544. The malpractice jurors would have to

find the controlling facts to be more probably true than not true. One of those facts entails whether the jury in the criminal case would have found guilt beyond a reasonable doubt had the defense lawyering been competent. The same problem arises in civil malpractice cases in which the cause of action allegedly lost in the original suit required proof by clear and convincing evidence, such as a fraud claim or willful or wanton conduct necessary for punitive damages. See *Kelly v. VinZant*, 287 Kan. 509, 515, 197 P.3d 803 (2008) (fraud); K.S.A. 60-3702 (punitive damages).

Moreover, adding an actual innocence element to criminal malpractice claims would not affect the formulation of the causation issue at all. Actual innocence would impose a gatekeeper element jurors would have to resolve before getting to either breach of the standard of care or causation. Jurors presumably would be instructed that if they found the criminal defendant failed to establish actual innocence, they should return a verdict for the lawyer without addressing any other aspects of the case. If they found the criminal defendant to be actually innocent, they would then have to consider the causation issue—formulated just as it would have been in the absence of an actual innocence element.

The *Wiley* court also suggested that damages would be difficult to assess in a criminal malpractice action and termed the task "perplexing." 19 Cal. 4th at 543. The injury principally entails an extended period of incarceration. A criminal defendant otherwise employable might have lost income, but the primary injury is the loss of liberty and the attendant noneconomic damages. The collective wisdom of 12 jurors would be especially insightful in rendering fair compensation for that sort of loss. See *Domann v. Pence*, 183 Kan. 135, 141, 325 P.2d 321 (1958).

The *Wiley* court also incorrectly reasoned that civil malpractice actions are much easier to resolve than criminal malpractice actions because the injured parties seek money damages equivalent to the money damages they should have received in the underlying civil suits lost through the lawyers' negligence. But, of course, the harm in the underlying civil suit may well have involved personal injuries, including pain and suffering and other noneconomic damages, that prove no more easily quantifiable than a loss of liberty. The jury

rendering a plaintiff's verdict in a malpractice action would have to make some evaluation of the reasonable damages in the underlying case to fashion an award. And juries hearing other tort actions routinely determine monetary damages to compensate for noneconomic injuries—not just for direct financial losses. The argument about the difficulty in assessing damages is a phony one. More to the point here, an actual innocence rule wouldn't materially alter the jurors' task in translating a wrongful loss of liberty into a dollar amount reflecting fair compensation.

*Actual Innocence Rule Fails in Its Stated Purposes*

Caterwauling aside, the actual innocence rule neither advances substantial public policy objectives rooted in legal doctrine nor facilitates the resolution of malpractice claims against criminal defense lawyers based on the existing tort law. Rather, it simply reflects a value judgment that a group of criminal defendants—those who may have committed offenses—should be deprived of a civil remedy against their lawyers when a given lawyer's abysmal performance resulted in a given defendant's conviction and incarceration. As I have outlined, criminal defendants regardless of guilt or innocence have a right to competent legal representation. Lawyers have a correlative duty to provide that level of representation to their clients. And the judicial process should afford those clients, regardless of guilt or innocence, the opportunity for full recompense if a violation of that right and duty results in their conviction and incarceration. The actual innocence rule denies one segment of the community of criminal defendants a remedy afforded the rest of that community essentially based on a characteristic unconnected to the right being vindicated. Common-law rulemaking ought to be guided by sound legal principles and undertaken to advance equally sound legal doctrine. The actual innocence rule partakes of neither. It rests on what is fundamentally a political and, hence, legislative evaluation of worthiness.

## IV. MALPRACTICE LITIGATION WITHOUT ACTUAL INNOCENCE RULE

Because I would reject the actual innocence rule as improvident

and inconsistent with established principles of both criminal law and tort law, I ought to discuss briefly how professional negligence actions would proceed without that rule. First, as required by *Canaan*, the criminal defendant would have to prevail on a 60-1507 motion. As I have said, the *Canaan* requirement provides an ample bulwark against frivolous malpractice actions. The Sixth Amendment measure for adequate representation applied to 60-1507 motions probably forgives more bad lawyering than the professional negligence standard governing malpractice actions. I will look at various outcomes that may follow a successful 60-1507 motion and how they would then play out in related professional negligence actions.

• The State retries the defendant on the original criminal charge, and he or she is found not guilty. The not guilty verdict certainly clears the way for the criminal defendant to pursue a legal malpractice action against the lawyer in the original trial. As in a malpractice action based on mishandled civil litigation, the client would have to prove substandard legal representation caused the adverse outcome (a conviction) in the original criminal prosecution and led to a compensable injury. The client would have to prove those elements by a preponderance of the evidence.

But, as I discuss, an acquittal in the retrial would not be a necessary condition for bringing a malpractice action based on the adverse outcome of the original criminal prosecution. The liability issues in the malpractice action depend on whether the original criminal defense lawyer breached the duty to provide adequate representation and, if so, whether that breach caused the defendant harm—time in prison and lost income, for example. Those determinations have nothing to do with the outcome of the retrial of the criminal case. The result of the retrial or other disposition of the criminal case would bear on the measure of damages. If the criminal defendant were again found guilty in the retrial and received the same sentence, he or she could not have suffered legal harm as the result of any imprisonment following the original trial—the time already served would be credited against the new sentence.

Neither the outcome of the 60-1507 motion nor the verdict in the retrial of the criminal case would be admissible in the civil malpractice action against the original criminal defense lawyer. Kansas requires mutuality to invoke collateral estoppel or issue preclusion. See *In re Tax Appeal of Fleet*, 293 Kan. 768, 778, 272 P.3d 583 (2012); *KPERS v. Reimer & Koger Assoc., Inc.*, 262 Kan. 635, 670, 941 P.2d 1321 (1997). Since the original lawyer would not have been a party in the 60-1507 proceeding or the second criminal trial, those judgments and the factual determinations supporting them could not be binding on him or her. Neither side could offer them in the malpractice action. Even in jurisdictions recognizing nonmutual, offensive collateral estoppel, the doctrine cannot be used to bind a party by a judgment reached in earlier litigation in which that party did not appear. See *United States v. Mendoza*, 464 U.S. 154, 158-59 & n.4, 104 S. Ct. 568, 78 L. Ed. 2d 379 (1984).

There are also practical considerations for excluding those rulings as evidence in the malpractice action. In deciding a 60-1507 motion, a court should grant relief if it concludes there is a "reasonable probability" that the jury would have returned a verdict other than guilty if the defendant's lawyer had performed in a constitutionally adequate manner. *Chamberlain*, 236 Kan. 650, Syl. ¶ 3. A reasonable probability in that context is a less demanding standard than the civil burden of proof of more probably true than not. See *Smith v. Cain*, 565 U.S. ___, 132 S. Ct. 627, 630, 181 L. Ed. 2d 571 (2012). So a court's decision to grant a 60-1507 motion wouldn't conclusively establish causation to the level required in a civil malpractice action.

The result of the criminal retrial ought not be treated as a conclusive determination of what the outcome of the original trial would have been in the absence of any legal malpractice. The evidence in the retrial would be qualitatively different and very likely quantitatively different. At a retrial, conservatively some 5 years or more after the original trial, some witnesses might no longer be available. Even assuming their testimony from the first trial could be admitted—a debatable proposition given the original defense lawyer's incompetence as demonstrated in the 60-1507 proceed-

ing—it probably would not be as well received as live testimony. But the memories of the available witnesses may have been dulled by the passage of time. It is hard to say in a given case which side might be more disadvantaged. But the State, as the party bearing the heavy burden of proof, would more commonly be hindered in a retrial long after the crime had been committed. In some cases, however, new evidence might turn up for the retrial—a prison informant asserting the defendant confessed to the crime, for example. So a retrial should not be considered merely an instant replay of the first trial such that the result would plainly or obviously reflect what would have happened. In turn, the outcome of the retrial would not really help the jurors hearing the malpractice case in accurately assessing causation.

As I have indicated, in the malpractice action, the criminal defendant would have to prove by a preponderance of the evidence that the performance of his or her lawyer in the original prosecution fell below the accepted standard of professional care, thereby violating the duty a lawyer owes a client. And the criminal defendant would have to prove that but for the lawyer's poor performance, the outcome of the original criminal case would have been more favorable, a finding of proximate cause. In broad terms, the proof would be comparable to what would be presented in a civil malpractice action, likely including expert testimony. Actual innocence has no bearing on those issues.

Damages in the malpractice action would flow from the sentence imposed following the conviction in the original criminal case. Assuming the criminal defendant were found not guilty in the retrial, the measure of damages would be the period of incarceration the criminal defendant served following conviction in the original prosecution. That would include demonstrable lost income and noneconomic damages compensating for the deprivation of liberty. If the criminal defendant had retained the malpracticing lawyer, the fee or a portion of it might be a recoverable damage. Because Mashaney had court-appointed lawyers for both the original trial and the direct appeal, I don't explore the fee issue further. Nor do I venture any suggestion about whether a criminal defendant would have an independent breach of contract claim for fees paid to a

malpracticing lawyer or what the elements or conditions precedent to that claim might be.

Jurors in the malpractice case obviously would hear evidence about the criminal defendant's guilt. And some of it might be compelling. The criminal defense lawyer presumably would argue he or she did a reasonable job given the State's evidence and information the client provided. Thus, the lawyer might argue defense options were limited because the client had admitted guilt in their pretrial conferences on possible strategies. But that sort of evidence of guilt, even if credited by the jurors, would not impose a legal bar to recovery in the malpractice action.

Actual innocence conceivably might become an issue on the extent of noneconomic damages. The criminal defendant might want to argue that the emotional distress of incarceration was particularly acute because he or she was, in fact, innocent. And the lawyer conversely could try to argue that the emotional impact wasn't especially great because the criminal defendant actually committed the crime. The former seems a plausible theory; the latter less so. Either argument, however, would open up actual innocence. But in a given case, a district court could well find the whole matter of actual innocence sufficiently remote and distracting and likely to consume undue time as to justify the exclusion of evidence on the point. See *State v. Prosper*, 260 Kan. 743, 748-49, 926 P.2d 231 (1996); *Doty v. Wells*, 9 Kan. App. 2d 378, 379-80, 682 P.2d 672, *rev. denied* 235 Kan. 1041 (1984). I don't plumb those evidentiary considerations further, since the discussion is wholly abstract given the majority's position that actual innocence must be fully ventilated as an element of liability.

If the State chose to dismiss the criminal charge rather than retry the defendant, the civil malpractice action would unfold in the same way.

• The State retries the criminal defendant on the original charge, and he or she is found guilty. Much of the earlier discussion is equally applicable here. The conviction on retrial would not be admissible as to liability in the civil malpractice action. The *Canaan* decision does not hold otherwise. It deals only with the original criminal conviction rather than the disposition of the charges after

the defendant has won a 60-1507 motion. *Canaan*, 276 Kan. at 131-32. The sentence imposed after the retrial would be a principal consideration on damages. If the criminal defendant received a sentence equal to or greater than the actual time he or she spent incarcerated on the original conviction, there is no cognizable injury. Suppose the criminal defendant had spent 6 years in prison on the original charge. Following the conviction on retrial, the district court imposes a 6-year sentence, reflecting a downward departure. The criminal defendant receives credit for the time served and is released. In that circumstance, the criminal defendant winds up no worse off because of the original lawyer's substandard performance—he or she would have had to serve the time on a valid conviction. The same would be true if the sentence on retrial exceeded the time the defendant served on the original conviction, a more likely scenario. Negligence alone does not support a tort action. The negligence also must cause a compensable injury. *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 585-86, 214 P.3d 1173 (2009); *Estate of Belden*, 46 Kan. App. 2d at 269. So that defendant would not have a legally viable malpractice suit.

If the new sentence were less than the defendant's time served, the damages would be confined to the period by which the time served exceeded the new sentence. Thus, if the criminal defendant had been in prison for 6 years and received a 5-year sentence following conviction on the retrial, the damages in the malpractice action would be limited to the economic and noneconomic harm from a year's incarceration.

• The State retries the defendant on the original charge, and the jury convicts on a lesser included offense. This is essentially a relatively limited variation on the preceding scenario in which the jury convicts of the original offense in the retrial. The significant issue becomes the sentence imposed for the crime of conviction as compared to the time the defendant served on the original charge. If the new sentence is less, then the criminal defendant has a legal malpractice claim based on the additional time he or she spent in prison on the original conviction. If the new sentence is the same

or greater, the defendant has suffered no actionable injury and, therefore, has no malpractice claim.

The lesser-included-offense scenario does, however, illustrate the analytical fragility of the actual innocence rule. Earlier, I alluded to the criminal defendant convicted of first-degree murder because his or her lawyer fumbled self-defense evidence that, if handled competently, would have led to an acquittal or a conviction for involuntary manslaughter. With an actual innocence requirement for legal malpractice actions, a criminal defendant would have a viable claim if he or she could prove to the civil jurors by a preponderance of the evidence that he or she acted in self-defense. But the defendant who proved that he or she lawfully resorted to self-defense but did so in an excessive or unlawful manner—constituting involuntary manslaughter—would have no civil claim for years spent in prison on the improper murder conviction. That stark dichotomy between a full civil remedy and no day in court at all cannot be justified on sound legal or policy grounds.[*]

[*] The actual innocence rule doesn't deal well with other dimensions of the criminal justice process that rest on arguments not directly tied to guilt or innocence. Thus, criminal defendants would have no civil remedy if their lawyers negligently failed to file winning motions to suppress key evidence. That would amount to a clear breach of the duty the lawyer owed the client directly, and the breach would lead directly to an unfavorable outcome in the criminal case. The rule's analytical unsoundness may be illustrated with more exotic situations. For example, criminal defendants should be found not guilty if they act under compulsion—they commit crimes only because they face immediate and real threats of death or great bodily harm if they don't. See K.S.A. 2012 Supp. 21-5206(a). But somebody acting under compulsion is not actually innocent; he or she has, in fact, committed the crime. Compulsion operates as a legal excuse, a value judgment that in those circumstances a person should not be punished for criminal conduct. See *State v. Schreiner*, 46 Kan. App. 2d 778, 796, 264 P.3d 1033 (2011), *rev. denied* 296 Kan. ___ (2013). A criminal defense lawyer's failure to raise or adequately present a valid compulsion defense would amount to professional negligence. But the client presum-

ably would be precluded from bringing a malpractice action because he or she couldn't demonstrate factual innocence. Perhaps supporters of actual innocence would create an exception in that case, something that's hardly clear from the caselaw. And while compulsion isn't an everyday aspect of criminal law, it fairly tests the prudential merit of an actual innocence rule and shows the rule to be wanting.

• The State continues the prosecution, and the criminal defendant enters a plea rather than going to trial. This scenario includes Mashaney's situation: he entered an *Alford* plea to two felonies different from the original charges and received a sentence that looks to have been between 6 months and 1 year less than the time he had spent in prison on his original conviction.

Without an actual innocence rule, a criminal defendant's plea to the original charge or an amended charge following a successful 60-1507 motion would make little difference in a civil malpractice action. Guilt or innocence would not be directly relevant to whether the original defense lawyer's incompetence deprived the client of a favorable outcome in the criminal case. As with a conviction on retrial, the length of the sentence would be much more significant.

To the extent actual innocence becomes relevant in a given malpractice case, a criminal defendant's statement made as part of a guilty plea that he committed the offense would constitute an admission and could be received as evidence. The resulting judicial finding of guilt and the judgment of conviction probably would not themselves be admissible. See *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 711-12, 732 P.2d 741 (1987). A plea of no contest entails no admission by the defendant and would be inadmissible. 240 Kan. at 711-12; K.S.A. 22-3209(2) (codifying that a no contest plea may not be used against the defendant in other proceedings). Here, Mashaney entered an *Alford* plea in which he did not dispute the State's evidence, but he made no admission of incriminating facts during the plea hearing and maintained his innocence of the charges. The district court accepted the plea and found Mashaney guilty of the amended charges of attempted aggravated battery based on the State's proffer of evidence it could have produced

during a retrial. The Kansas Supreme Court has recognized that a criminal defendant entering an *Alford* plea makes no admissions of guilt. *State v. Case*, 289 Kan. 457, 464-65, 213 P.3d 429 (2009). I would, therefore, suppose that a finding of guilt based on an *Alford* plea would not be admissible in the malpractice action. *Cf. Federal Deposit Ins. Corp. v. Cloonan*, 165 Kan. 68, Syl. ¶ 1, 193 P.2d 656 (1948) (At a time when no-contest pleas were not recognized in state court practice, the court held that such a plea entered in federal court could not be used against a defendant as an admission in a civil action related to the same matters.).

While the character of the defendant's plea is largely immaterial to liability in the malpractice action, the sentence imposed directly affects potential damages. If the sentence is for time already served or a longer period, then the criminal defendant has not suffered a compensable injury to support a malpractice action. A shorter sentence, however, creates a compensable harm—presuming a finding of liability—resulting from the criminal defendant's incarceration for the difference between the new sentence and the duration of actual imprisonment.

In this case, the record shows Mashaney received a sentence of 72 months or 5 years on the amended charges to which he eventually entered the *Alford* plea. The record also indicates that was less than the time he spent in prison following his original conviction, as his direct appeal and then his 60-1507 motion worked their way through the system. But the record is less than clear about exactly how long Mashaney was incarcerated. He appears to have been in prison for about 79 or 80 months. By my reckoning, Mashaney ought to be permitted to proceed with a legal malpractice action in which his damages would be based on the period of incarceration by which his actual imprisonment exceeded the 72-month sentence. I would, therefore, reverse and remand for further proceedings.